# **ATTACHMENT A**

On or about September 6, 2010, in the State and District of Colorado, and elsewhere, for the purpose of executing a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent material pretenses, representations and, the defendant did knowingly transmit and  cause to be transmitted in interstate commerce, from or to a place within the State of Colorado to or from a place outside of the State of Colorado, by means of wire communications, certain signals and sounds, representing and constituting the following transaction: An email message from bobby@dresdnerfinancial.com to geoff@dresdnerfinancial.com.

In violation of Title 18, United States Code, Sections 1343 and 2.

## ATTACHMENT B

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kristen Varel, hereinafter referred to as the affiant, being duly sworn hereby state the following under penalty of perjury:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since February 2013.  I am currently assigned to the Denver Division to a squad responsible for investigating complex financial crimes.  My duties and responsibilities include the investigation of federal criminal statutes, including suspected violations involving securities fraud.

2.      This affidavit is submitted in support of an application for a criminal complaint and arrest warrant of Jaimie J. BEEBE.  Based on what I describe below, I submit that there is probable cause to believe that from approximately February 2010 to February 2011, BEEBE, working together and in concert with Geoffrey H. Lunn,  raised more than $5.77 million from approximately 70 investors from throughout the United States and several foreign countries, through a fictitious business called Dresdner Financial ("Dresdner").  This money was raised as part of a fraudulent scheme (for which Lunn has already been charged as a defendant in this Court in Case Number 14-cr-00161-REB), in violation of 18 U.S.C. §1343 (Wire Fraud), among other federal criminal statutes.

3.       The facts in this affidavit are based upon my personal observations, interviews I, or other FBI agents have conducted, bank account and other records acquired during the criminal investigation of this matter; a parallel civil investigation conducted by the U.S. Securities and Exchange Commission (SEC); my training and experience; and other information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

1

## STATEMENT OF PROBABLE CAUSE

**Overview of the Investigation.**

4.      In or about early 2011, the FBI commenced a criminal investigation of Geoffrey H. Lunn, d/b/a WGC Group, Inc., and various associated persons operating under the name Dresdner Financial, based on information received from the SEC concerning a suspected fraudulent high yield investment scheme that was being operated by Lunn and others.  I joined this investigation and became the FBI's case agent in November 2013.  During the course of the criminal investigation, the FBI interviewed Lunn twice:  in May 2011, by a prior FBI case agent, and again in January 2014, by me and a fellow FBI special agent.  As part of its own investigation of Dresdner Financial, the SEC took Lunn's sworn testimony in April 2011. During these interviews and testimony, Lunn maintained that the founder and head of Dresdner Financial, and the architect and overseer of the high yield investment programs that were under investigation, was an individual known to him and his wife, as "Robert" or "Robert Perello", and to others as "Bobby Perello," amongst other names. Others who helped administer these investment programs also reported interacting with and taking directions from an individual going by these names, and several investors also reported interacting with the same individual.

5.      Based on the information acquired during the FBI's criminal investigation (which included interviews of various Dresdner Financial associates, investors, and family members of the subjects) and information from the SEC as a result of its parallel civil investigation, I have learned and concluded that Dresdner Financial was not a real company or a legal entity of any type, or even a trade name for an actual entity, but rather simply a name used to perpetuate an investment fraud scheme.  The purported company and its investment programs, I have concluded, were actually the product of invention by the individual known to Lunn and others as "Robert Perello" or "Bobby Perello," and the programs, and fraudulent scheme underlying it, were largely carried out by Lunn (aided by a network of affiliates) but done so largely at "Perello's" direction.  Further, over the course of the criminal investigation,

2

through the evidence summarized below, I and others working on the criminal investigation have determined that "Robert Perello" and "Bobby Perello", as well as related names, are actually aliases of BEEBE, an erstwhile resident of the States of California and New Mexico who is currently in pretrial detention facing state criminal charges in New Mexico on an unrelated case.

6.     Based on these various sources of evidence, I describe below how the fraudulent investment scheme operated and how BEEBE, using his various aliases (collectively alternatively referenced hereafter as "Perello" or "Robert Perello" or by his true name), orchestrated and oversaw it.

**Details of the Investigation**.

7.     The investment scheme was marketed, in part, through a website that was established in the name of Dresdner Financial (www.dresdnerfinancial.com), as well as through a network of "affiliates" who were responsible for soliciting investor funds in exchange for receiving commission based on the amount of funds solicited. According to this website, Dresdner Financial had an "extensive network of connections with the Top-50 banking institutions in the world" and was the "leader in creative commercial financing, bank instruments, bond programs, and more." The website provided a phone number and a physical address for Dresdner Financial in Chicago, Illinois. FBI agents involved in this matter investigated this contact information provided for Dresdner Financial and determined that Dresdner did not maintain an office at that particular address or anywhere else in Chicago and were unable to locate a physical address for the purported company anywhere else in the United States. These agents determined that the phone number listed for Dresdner Financial in this website was a prepaid cell phone registered under a fictitious name. Further, the name "Dresdner Financial" appeared to have been purposefully chosen to lead prospective investors into believing that the fictitious entity was affiliated with Dresdner Bank (formerly one of Germany's largest banks):  Indeed, Lunn expressly represented that he and other Dresdner Financial principals had connections to the German bank. However, neither the FBI nor the SEC could find any real affiliation between the German bank and "Dresdner Financial."

3

8.      The scheme -- as portrayed on the purported company's website, and in documents and other information provided to investors -- primarily involved an investment opportunity that was marketed under, and was part of a purported investment program called the Dresdner Financial .44 Magnum Leveraged Financing Program, hereafter referred to as ".44 Magnum." Investors of Dresdner were individuals and/or companies in need of raising capital for business ventures or projects. Dresdner claimed to have access to "managed buy/sell trading platforms" which leverage and "monetize" bonds, stocks, notes, letters of credit, and other financial instruments. Investors were told that .44 Magnum offered guaranteed profits through a process that involved leasing and monetizing bank instruments. They were told that their money would be used in connection with securing these bank instruments. Although the timing and amount of the promised payouts varied, many of the investor contracts with Dresdner Financial stated that an investment of $44,000 would yield a return of $2 million after 10-12 days. Comparable returns were promised for other investment amounts. Documents for this program also indicated the client's funds were 100% guaranteed and that the actual returns were also 100% guaranteed. The website, according to Lunn, was set up and administered by "Perello," who provided both Lunn and the affiliates with email accounts linked to the site to use in their communications.

9.      Through FBI interviews and investigative testimony taken by the SEC as part of its investigation, as well as records acquired in connection with both, I have learned that Geoffrey Lunn was responsible for signing up affiliates for the Dresdner Financial .44 Magnum Program. Lunn indicated that he took his directions concerning affiliates from "Perello," however, and both Lunn and the affiliates themselves indicated that "Perello" was involved in the overall process of recruiting and training affiliates. Emails between an individual using the email address bobby@dresdnerfinancial.com and Lunn and the affiliates appear to substantiate this involvement. (Both Lunn and several of the affiliates who were interviewed indicated that this was the email account used by "Perello" and Lunn indicated it was used exclusively by "Perello.") Moreover, Lunn, and several of the affiliates and prospective investors indicated that "Perello" also conducted conference calls with the affiliates and investors during

4

which he explained the workings of .44 Magnum.  During these calls, "Perello" and the affiliates told investors and prospective investors that .44 Magnum involved complex financial transactions and they described the workings of the investment program, which included some or all of the following steps:

    a) The investor would complete and submit the required paperwork;

    b) Dresdner would ensure that the investor passed compliance and provided the investor with instructions for submitting the money via wire transfer;

    c) Dresdner would use the investor's money to lease a bank instrument, such as a bank guarantee or standby letter of credit;

    d) Dresdner would obtain an "insurance wrap" for the bank instrument;

    e) Dresdner would "monetize" the bank instrument;

    f) Dresdner would use a portion of the proceeds from the "monetization" to pay the investor the promised return; and

    g) Dresdner would place the remaining proceeds into a trading platform to earn its profits.

    10.    Upon entering into an agreement, Dresdner clients were directed to send their funds via wire transfer to bank account number 0984214313, in the name of WGC Group, Inc., maintained with JP Morgan Chase Bank.  "Perello," according to Lunn, directed Lunn to accept funds into this account and provided documents with wiring instructions to investors; email correspondence between Lunn and bobby@dresdnerfinancial.com appear to substantiate these claims.  The account, for which Lunn was the sole signatory, was set up with and used a P.O. Box in Boulder, Colorado as its mailing address. The account holder, WGC Group Inc., was determined to be a Nevada registered corporation doing business in Colorado that listed Lunn as its registered agent.  Colorado Secretary of State filing records showed that WGC Group Inc. listed its mailing address with the Colorado Secretary of State as 4608 Greenbriar Court, Boulder, Colorado, Lunn's residential address during the time that .44 Magnum was in operation.

Almost all of the $5.77 million in investor funds solicited as part of the investment scheme were received into this account. The investor funds included the following wire transfers:

    a) On September 14, 2010, a wire transfer for $250,000 was received from Dunamis Diversified Industries on behalf of JAC into the JP Morgan Chase account noted above for .44 Magnum.

    b) On October 26, 2010, an individual, JV, wired $300,000 from a Wells Fargo Bank branch in La Jolla, California to the JP Morgan Chase account noted above in exchange for participation in .44 Magnum.

    c) On October 28, 2010, Hybrid Finance wired $200,000 for .44 Magnum.

Each of these wire transfers involved or was facilitated by interstate or foreign wire communications, as almost all of the Dresdner .44 Magnum investors and investor groups operated and did their banking within the United States outside of the State of Colorado and several operated and conducted their banking outside of the United States. During this scheme, Lunn resided in the State of Colorado and so would have primarily maintained and administered the WGC Group, Inc. bank account with JP Morgan Chase from within Colorado. Since "Perello" distributed wiring instructions to Lunn to pass along to investors, he indirectly caused the transmissions to occur across state lines as discussed here.

    11.    Lunn and "Perello" additionally furthered the investment scheme using interstate wire communications through the emails they exchanged about the scheme. These emails -- sent between "Perello," using his bobby@dresdnerfinancial.com account and operating outside of Colorado,[1] and Lunn, using his assigned Dresdner Financial email account, geoff@dresdnerfinancial.com, and residing in Colorado -- included the following:

---

[1] During the investigation, Lunn related to me and other FBI agents working this case that he never dealt with "Perello" in Colorado and that all of his interactions with him were either by telephone or email or in person in other states. Lunn understood "Perello" to be residing and operating mainly in and about the vicinities of Los Angeles, California and Albuquerque, New Mexico, and, as discussed below, the FBI has identified BEEBE as having primarily resided in these locations during the time frame of the investment scheme.

a) An email dated September 6, 2010, in which "Perello" forwarded a message from potential investor AH to Lunn with a message that this guy has still not completed all of the documents which he was advised to complete.

b) An email dated May 24, 2010 from "Perello" to Lunn instructing Lunn to replace the "Word documents" with the attached final version and identifying the "Finance Agreement" being the 5000% return and the "Leveraged Finance Agreement" as the 500% return. (I reviewed the attachments and saw that they constituted the types of agreements and related investor documents that investors were given in connection with signing up for the investment programs.)

c) An email dated April 1, 2010 from "Perello" to Lunn, with the subject line, "Alicia Watsn (Affiliate Package)," with a forwarded message with an attached package from Alicia Watson.

d) An email dated May 26, 2010 from "Perello" to Lunn, with the subject line, ".44 Magnum Leveraged Finance Agreement & Procedures (.pdf)." (This email provided Lunn with the .44 Magnum Agreement required for the program.)

e) An email dated October 7, 2010, from "Perello" to Lunn which included the .44 Magnum – entry, advance, pay-out & commission chart.

12. Although investors were promised that their money would be returned to them within several weeks, together with the promised returns, none of the investors received their money back within the time frames initially promised, nor did any receive the types of returns initially promised to them. None but a handful of investors received any money back at all. When payout timelines were missed, various excuses were given to the investors as to the reason for the delay. Investors were reassured that they would receive their payout. The excuses, for the most part, came from Lunn and were relayed to the investors through the Dresdner Financial affiliates. During his SEC testimony, Lunn admitted that the information he told investors about delays was false. Lunn acknowledged in his testimony that he "prolonged the process and just made up excuses," though he blamed some of the excuses on "Perello."

13. A review of bank records for the WGC Group, Inc. JP Morgan Chase Bank account reflected that none of the investors' money was used as promised. No transaction could be identified that appeared to be linked to the purchase or lease of bank instruments or any other promised investment use. Rather, Lunn used the money for various apparent non-investment purposes, including as follows:

a) After the first investor deposit, Lunn started making cash withdrawals and later on made money transfers through Western Union and MoneyGram. Over time, he withdrew

7

approximately $955,377 in cash and in Western Union and MoneyGram transfers.  Lunn was questioned by the SEC and the FBI on separate occasions about these transactions and acknowledged making them, but said that the money went to "Perello", who, according to Lunn, was the one responsible for using the investors' money to obtain the promised bank instruments and to use them to achieve the promised returns.  Lunn stated he realized virtually from the beginning of working for Dresdner Financial that "Perello" had no intention of using the investor money as promised, describing "Perello" in his SEC testimony as basically a "con man" and relating to the SEC that "Perello" confided in him at one point that "Perello" had chosen to call Dresdner Financial' s lead investment offering the ".44 Magnum" program" because "[w]hen people found out that they'd been ripped off, they would buy a .44 Magnum and shoot themselves in the head."  Lunn stated that he nevertheless continued to give "Perello" investor funds in this manner, as requested, because he feared that the man would do harm to him and his family if he did not comply.

b)  Lunn further explained both in his SEC testimony and in his FBI interviews how he got the cash that he withdrew from the WGC Group bank account to "Perello." He explained that "Perello" would call him to set up meetings for Lunn to deliver large amounts of cash to him and that Lunn, in the days leading to these meetings, would make multiple cash withdrawals from numerous banks in the Boulder, Colorado, and Denver metro areas prior to the meetings.  Lunn stated that he would then meet "Perello" in Las Vegas, Albuquerque, and Los Angeles.  Lunn stated that he would put the cash in a bag or metal suitcase and either drive or fly to meet "Perello" "either in Las Vegas, Albuquerque, or Los Angeles.

b.1)  During the course of the investigation, I recovered records that Lunn had maintained, but later abandoned, concerning his involvement with Dresdner Financial and, in particular, his dealings with "Perello."  Included among these records were flight itineraries, rental car receipts, ATM receipts, restaurant bills, and hotel invoices that showed Lunn's cash withdrawals and trips

8

to these cities. Also among these records were receipts for the money transfers that Lunn claimed to make. Scribbled on some of these items, in Lunn's handwriting, was the name "Robert." Using these records – together with bank account records for Lunn's WGC Group, Inc. account and records from Western Union and MoneyGram – I recently debriefed Lunn about the various trips he made to deliver cash to "Perello" and the money transfers that he also made to or on "Perello's" behalf. I was able to determine that Lunn had made a total of twelve trips to these cities over the course of February 2010 through October 2010 and was able to ascertain that Lunn provided "Perello" approximately $817,002 in cash during or in connection with these trips. I also reviewed the Western Union and MoneyGram records with Lunn and was able to ascertain that Lunn made money transfers totaling approximately $138,375 over the course of February 2010 through February 2011.

c) Lunn paid approximately $1.4 million to affiliates, as purported advances of commissions that would ostensibly be earned when (and if) the investment transactions were consummated. I learned from Lunn and one of the affiliates, DB, that the idea to make these "advances" came from "Perello" after delays continued to mount in providing the affiliates and their investors the promised payouts from the programs. These commission advances were paid based on a schedule prepared by "Perello" and provided to Lunn in the email mentioned in 11e above.

14. Over the course of the investigation, multiple investors or affiliates have confirmed speaking individually with "Perello" on the phone or on conference calls with Lunn. These investors believed that Perello was the principal operator of Dresdner. Several examples of these telephone contacts follow:

a) On a call with investor DK, BEEBE insisted that the program and Lunn were great.

9

b) On a conference call with investor PE, affiliate VC, and Lunn, BEEBE said that the program would pay out more because it was taking so long. PE understood him to live in New Mexico and California as well as spending some time in New York.

c) Over 5-6 phone calls with affiliate DB, BEEBE said that since the affiliates were working so hard, he was going to raise the entry fees for clients in order to have money to pay the affiliates an advance.

d) On a phone call with investor RB, BEEBE described two different programs. One program for a $10,000 entry fee and another program with a $44,000 entry fee for a one million return in 10 days.

### Evidence Linking "Robert Perello" to JAIME J. BEEBE.

15. During the course of his SEC testimony and his interviews with the FBI, Lunn provided a description of the individual whom he knew as "Robert Perello." Lunn mentioned as part of the description that the man had a disfigured left eye which, according to Lunn, resulted from an injury that took place during a fight. He also indicated that, at the inception of their business dealings, Lunn had learned that, unbeknownst to him at the time, "Perello" had rented an apartment in Southern California under the name of WGC Group, Inc., Lunn's corporation, and listing Lunn's name and address as contact information for the rental. As part of the criminal investigation, the FBI obtained the rental records from this apartment and determined that the person listed as the tenant during this rental was a woman named Lorena Lucero. FBI agents working this case tracked Lucero down to New Mexico and briefly interviewed her on the phone. During the interview, Lucero confirmed living at the apartment and staying there with her husband, whom she identified as BEEBE.

16. The FBI thereafter obtained a New Mexico driver's license photograph of Beebe and, using public records databases, determined that Beebe had mostly lived in both the Albuquerque, New Mexico and Southern California areas for a number of years, including the years that were under

investigation. The driver's license photograph indicated some apparent disfigurement with BEEBE's left eye.

17. During his FBI interviews, I and other agents showed Lunn the New Mexico driver's license photograph of BEEBE, and Lunn positively confirmed that the photograph depicted the "Robert Perello" with whom he had dealt as part of the Dresdner Financial investment scheme. During one of these interviews, Lunn also produced and provided to the FBI a photograph of "Perello" and a person whom Lunn claimed to be Perello's spouse – a woman whom Lunn indicated he had met on several of his trips to deliver cash to "Perello" – sitting inside the back of a vehicle. The photograph, which Lunn claimed to have obtained from the social media website Facebook, appears to depict both BEEBE and his spouse Lucero.

18. Lunn also mentioned during these interviews and in SEC testimony that his wife, Carolyn, accompanied him on two of the trips to Las Vegas to deliver money to "Robert Perello." I and other FBI agents accordingly contacted and interviewed Carolyn Lunn about this information. During the interviews, Carolyn Lunn confirmed that, at Lunn's request, she accompanied her husband on two separate occasions to meet "Perello," whom her husband identified only as "Robert," and "Robert's" spouse in that city. Carolyn Lunn stated that she met and spent time in a social setting with both "Robert," whom she understood was in some sort of business with her husband, and his spouse while in Las Vegas, although the two men met separately over the course of these two trips to discuss business. In subsequent debriefings, she indicated that her husband introduced his business partner to her as "Robert" and referred to him by that name while they were all together and that she was introduced to and referred to "Robert's "spouse as "Lorena." She also said that she met the couple's young son, "Alessandro," on one of these trips. Carolyn Lunn was shown both BEEBE's New Mexico driver's license photograph and the Facebook photograph of Lucero and BEEBE and confirmed BEEBE was the person she knew as "Robert" and Lucero was the person she knew as "Lorena."

11

19. I subsequently contacted and interviewed Lucero as part of the criminal investigation. She confirmed that BEEBE was her spouse and identified him both from his New Mexico driver's license photograph and the Facebook photograph provided by Lunn. She related that she had lived together with BEEBE in multiple places in Southern California and the Albuquerque, New Mexico area over the years and that the couple had a small son, Alessandro. She confirmed that she had traveled to Las Vegas on two separate occasions with BEEBE to meet a person whom she knew as "Geoff " or "Jeff" and that she met and spent time with that man's wife, "Carolyn," while she was there. Lucero stated that her encounters with Geoff/Jeff and his wife were social in nature but that Geoff/Jeff and BEEBE met separately while in Las Vegas. On at least one of the Las Vegas trips, she observed in her and BEEBE's hotel room a briefcase and large amounts of cash. Lucero also related that she drove BEEBE to several meetings with Geoff/Jeff in Albuquerque and indicated that some of the meetings would be in a particular restaurant. She confirmed this restaurant's name from one of the restaurant bills that Lunn had kept from his visits to see "Perello." Lucero was shown driver's license photographs of both Lunn and his wife, Carolyn, and identified the photos as depicting the Geoff/Jeff whom she knew through Beebe. She could not identify "Carolyn" from Carolyn's driver's license photograph.

20. FBI interviews with Lucero led to additional evidence linking BEEBE to the man with whom Lunn was dealing as part of the Dresdner Financial investment scheme. As part of the criminal investigation, the FBI came upon records reflecting that in May 2010 Lucero made a $16,000 cash purchase of a Green, 2003 Land Rover from an auto dealership in Albuquerque, NM for Perello. During an interview with an FBI agent, Lucero stated that her husband, BEEBE gave her the funds for the vehicle and that it was being purchased for a friend. Lucero indicated that she did not ask questions because she was "trusting and helping her husband out." The FBI obtained records showing that the vehicle was then shipped to California to an address of a residence to which, Lucero indicated, she and BEEBE were moving. The records listed the shipper's name as "Bobby Perello" and reflected that the transportation was being paid with a credit card in Geoffrey Lunn's name.

12

21.	I also learned through the FBI's interview of Lucero that she had a son, Carlos Ramirez, a name that I had seen listed as a recipient of a number of Western Union or MoneyGram money transfers that Lunn had sent out of the WGC Group, Inc. bank account. An FBI agent contacted and telephonically interviewed Carlos Ramirez, who confirmed that he was Jaime J. BEEBE's stepson.  Ramirez in this interview stated that the name Geoffrey Lunn sounded familiar "but he could not place it."  I subsequently debriefed Ramirez in person and he confirmed that he had received a number of Western Union or MoneyGram transfers that had been sent by a man whom he knew through BEEBE as "Geoff" or "Jeff." He also identified a number of other money transfers that Lunn had sent to Ramirez's girlfriend.  The transfers, according to Ramirez, were initiated at BEEBE's request to repay money that BEEBE owed to Ramirez.  Ramirez also confirmed that he met both Geoff/Jeff and his spouse, Carolyn, in Las Vegas while Ramirez was visiting BEEBE and Lucero. He also met Geoff/Jeff in New Mexico when Geoff/Jeff was there to see BEEBE. Ramirez understood that BEEBE and Geoff/Jeff were in some sort of business together.   Ramirez was unable to identify Lunn through a driver's license photograph as the person he met. However, Ramirez did see Carolyn Lunn and identified her as the person who was with them in Las Vegas.

//

**Conclusion**

Based on the foregoing, I respectfully submit that there is probable cause to believe that from February 2010 through February 2011 BEEBE, together with Lunn devised and executed a wire fraud scheme to defraud approximately 70 investors (including through the interstate wire communications described in paragraphs 11a through 11e above), in violation of Title 18 U.S.C. §1343.

FURTHER AFFIANT SAYETH NAUGHT.

Reviewed and submitted by Kenneth M. Harmon, Assistant U.S. Attorney

                                      s/Kristen Varel
                                      KRISTEN VAREL, SPECIAL AGENT
                                      FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed to before me,
this 10th day of December 2014,
at Denver, Colorado

UNITED STATES MAGISTRATE JUDGE
Michael J. Watanabe