## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 14-cr-00161-REB-2

UNITED STATES OF AMERICA,

        Plaintiff,

v.

2.     JAIME J. BEEBE,

        Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Kenneth M. Harmon and Martha A. Paluch, Assistant United States Attorneys for the District of Colorado, and the defendant, Jaime Beebe, personally and by counsel, David L. Owen, Jr., Esq., submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C.COLO.LCrR 11.1.

## I. **PLEA AGREEMENT**

A.    The defendant agrees to plead guilty to Count 23 of the Second Superseding Indictment, charging him with wire fraud, in violation of Title 18, United States Code, Section 1343.

B.    The defendant further agrees that, although he is not entering guilty pleas to all of the counts alleged as predicate offenses for the forfeiture allegations set forth in the Second Superseding Indictment, he will consent to forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in all

Court's Exhibit

1

such charged offenses (not just the offense of conviction), as well as the underlying scheme with which he is charged in the Second Superseding Indictment, including, but not limited to, (a) a money judgment not exceeding approximately $5,124,795, the total amount currently believed to have been raised from investors and investor groups pursuant to the scheme charged in the Second Superseding Indictment minus the returns of principal investment amounts to them; and (b) property which may be deemed substitute assets up to the value of forfeitable property, as described in paragraph 27 of the Second Superseding Indictment.

C.     The parties agree that restitution is mandatory in this case.  The defendant agrees that, although he is entering a guilty plea only to one count of wire fraud, restitution due and owing from him should be calculated and based on all of the losses associated with the entirety of his conduct and the charged fraudulent scheme, and is not limited to losses associated solely with respect to any particular victim connected to the wire transaction identified in Count 23 of the Second Superseding Indictment. The defendant agrees, moreover, that he should be subject to an order of restitution, in particular, for all losses of principal of all those investors who lost money as a result of the charged fraudulent scheme and its related conduct.  The parties currently estimate that such losses to investors collectively total approximately $5,124,795.  The specific victims entitled to restitution and the particular amounts owed to them in restitution shall be determined by the Court at sentencing.

D.     The Office of the United States Attorney for the District of Colorado agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on Count 23 of the Second Superseding Indictment -- it will move to dismiss with respect to him, with prejudice, the remaining counts of the Second Superseding Indictment and the Superseding Indictment, following sentencing.  The Office of the United States Attorney for the District of Colorado

further agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on Count 23 of the Second Superseding Indictment and the defendant's fulfillment of his other plea obligations -- it will not further prosecute the defendant for the conduct set forth in the pending indictments in this case or any other criminal conduct known to the Office of the United States Attorney for the District of Colorado as of the date of this plea agreement, which conduct concerns the defendant's activities relating to and arising out of the scheme set forth in the pending indictments.

E.1.    The parties acknowledge that, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court, while not bound by them, is required to consider the United States Sentencing Guidelines and determine the defendant's applicable sentencing guideline range, in deciding the sentence in this case.

E.2.    The government agrees to take the positions ascribed to it regarding the sentencing factors set forth in Part VI herein (the parties' Advisory Guideline Computation and 3553 Advisement), which positions would result in an advisory sentencing guideline range of 87 to 108 months, based on Offense Level 27, the adjusted offense level resulting from the government's sentencing guideline positions, and assuming that the defendant's criminal history places him in Criminal History Category III.

E.3.    The defendant is free, at the time of sentencing, to contest and make arguments opposing the government's sentencing guideline positions or the application of the various offense level adjustments incorporated into the calculation of his applicable sentencing guideline range provided that such arguments are not inconsistent with the positions ascribed to him regarding the sentencing factors set forth in Part VI herein and are not inconsistent with his entry of a guilty plea and admission of guilt with respect to Count 23 of the Second Superseding Indictment or with the

body of stipulated facts set forth in Part V herein (the parties' Stipulation of Facts).[1]  The defendant is further free at the time of sentencing to make arguments concerning his criminal history score and resulting criminal history category for the purpose of sentencing guideline analysis.

E.4.    The defendant is further free, at the time of sentencing, to make to the Court any arguments in support of any lawful sentence in this case, provided, however, that such arguments are not inconsistent with the positions ascribed to him regarding the sentencing factors set forth in Part VI herein and are not factually inconsistent with his entry of guilty pleas and admissions of guilt with respect to Count 23 of the Second Superseding Indictment or with the body of stipulated facts set forth in Part V herein (the parties' Stipulation of Facts).

E.5.    The government will determine its position with respect to any argument that the defendant advances in support of a sentence at variance with a sentence within the applicable sentencing guideline range, and will take a position with respect to such arguments, at the time of sentencing.

F.      The parties understand, acknowledge, and agree that the sentencing recommendations of the parties under this plea agreement are made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and are not binding on the Court.

## II.  THE ELEMENTS OF THE OFFENSE

The defendant understands that, in order to be convicted of the offense of wire fraud, in violation of 18 U.S.C. § 1343, as charged in Count 23 of the Second Superseding Indictment, the

---

[1]      The parties understand, acknowledge and agree that the body of stipulated facts referenced in this paragraph excludes any factual averments based on the government's evidence with which the defendant takes issue, as denoted in Part V.

government, at trial, would have to prove the following essential elements beyond a reasonable doubt:

1. The defendant devised or intended to devise a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises as described in the indictment;

2. The defendant acted with specific intent to defraud and to obtain money or property by means of false or fraudulent pretenses, representations or promises;

3. The defendant used interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

4. The scheme employed false or fraudulent pretenses, representations, or promises that were material.[2]

## III.  STATUTORY PENALTIES

The maximum statutory penalty for the offense set forth in Count 23 of the Superseding Indictment is: not more than twenty (20) years imprisonment; not more than a $250,000 fine or alternatively a fine that is twice the amount of the criminally derived property involved in the charged transaction; or both imprisonment and a fine; not more than three (3) years supervised release; a $100 special assessment fee; plus restitution.

A violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.  COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.  STIPULATION OF FACTS

---

[2]     Tenth Circuit Pattern Jury Instruction 2.57 (2011) (modified).

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is in or about February 2010.

The parties agree that the government's evidence[3] would establish the following:

**Background and Summary of the Fraudulent Scheme.**

A.      During the times material to this case, the defendant resided in and about Southern California and Albuquerque, New Mexico and conducted his affairs under various aliases.   In or about 2009, the defendant met co-defendant Geoffrey Lunn, a resident of Boulder County, Colorado, who, at the time, was a self-employed real estate broker attempting to develop and

---

[3]      The defendant understands and acknowledges that this evidence includes, but is not limited to, the anticipated trial testimony of co-defendant Geoffrey Lunn, as summarized and reflected in various proffers of interview memorialized in reports of interviews provided to the defendant as part of the government's pretrial disclosures in this case.

pursue a real estate investment and real estate financing business through WGC Group, Inc. ("WGC Group"), a Nevada corporation that he had formed for this purpose. According to Lunn, the defendant was first introduced to him under the name "Robert Paluscek," and he sought the defendant's help in raising financing for his real estate investment business.

B.      Commencing in or about February 2010 and continuing through in or about March 2011, the defendant and co-defendant Lunn collaborated in offering an array of purported high yield investment programs to the investing public through a purported entity called Dresdner Financial ("Dresdner") and, in relation to two particular investment programs offered through Dresdner, collecting over $5.8 million in advance fees from investors in exchange for undertaking to secure for these investors commercial financing in the form of non-recourse loans backed by pledged financial instruments. During this collaboration, the defendant held himself out to investors and others involved in the programs as "Robert Perello" or "Bobby Perello."[4]  The two

---

[4]      As part of the investigation leading to this case, the government acquired an assortment of evidence linking the defendant to this alias and the use of a Dresdner email account in the name of this alias. Among other things, co-defendant Lunn identified the defendant, from photographs, as the "Robert Perello" with whom he was collaborating in connection with the Dresdner investment programs. Additionally, both co-defendant Lunn's spouse at the time and Beebe's estranged spouse and stepson, through photographs, identified Beebe and Lunn as business partners.

All three also identified Beebe's voice as that of a person who, at one point in March 2011, identifying himself as "Bobby Perello," placed a recorded call to a telephone answering service used by Lunn. The name under which the telephone number used to place this call was subscribed, the government would further show, was an alias used by the defendant.

Additionally, various investors and other persons involved in the Dresdner investment programs would testify that they dealt – both by telephone and email messages -- with a person named "Bobby Perello" or "Robert Perello" in concert with co-defendant Lunn. The government would offer analysis of telephone records, among other things, to establish that these telephone numbers were subscribed to and used by the defendant under one or more aliases.

At the time of his arrest in this case, the defendant acknowledged knowing and having business dealings with co-defendant Lunn, and admitted to receiving a total of approximately $200,000, in order to secure investment leads for Lunn, but denied using the names "Robert Perello" or "Bobby Perello" or knowing anyone by that name. He also

investment programs through which the defendants raised the approximate $5.8 million in advance fees were primarily known as the "Bullet and Rocket Leveraged Financing Program" ("hereinafter, the "Bullet and Rocket Program") and the ".44 Magnum Leveraged Financing Program" (hereinafter, the ".44 Magnum Program").

C.    As part of their collaboration, co-defendant Lunn agreed, among other things, to allow a bank account that he maintained for WGC Group to be used to collect and disburse investor funds taken in through the Dresdner investment programs.   The defendant, for his part, among other things, created and maintained a website for the Dresdner investment programs and developed written materials describing and marketing the investment programs and various written agreements and related documents to be used with investors participating in the programs.

D.    The defendant and co-defendant Lunn marketed Dresdner's investment programs through the website and through a network of sales affiliates who solicited investor funds in exchange for receiving commissions based on the amounts they brought into Dresdner.   In the written materials prepared by the defendant and posted on its website, and in oral representations made by both defendants and their sales affiliates, Dresdner was portrayed as a "leader in creative Commercial Financing, Bank Instruments, Bond Programs and more" and boasted of having an "extensive network of connections with the Top-50 banking institutions in the world." Supposedly headquartered in Chicago, Illinois, the purported financial services company claimed to sponsor and administer an assortment of investment programs offering the prospect of extraordinary, above-market returns over a short period of time, which programs centered around the acquisition, purported "monetization," and trading of a variety of bank instruments, such as bank guarantees,

---

denied knowing anything about the entity Dresdner Financial or investment programs offered through an entity by such name.

standby letters of credit and medium term notes. The investment programs, which included the Bullet and Rocket and .44 Magnum Programs, were primarily targeted at persons and organizations seeking financing for various types of commercial projects.

E.     In written and oral communications with affiliates, investors and prospective investors, the defendant was held out by others as the founder of Dresdner and, variously, its purported president, one of its other senior officers or one of its senior consultants.   Co-defendant Lunn was portrayed as Dresdner's vice president and held himself out, at times, as being one of Dresdner's officers and, at times, as being one of its sales affiliates.   Playing off of its name, co-defendant Lunn and certain of Dresdner's affiliates led various investors to believe that Dresdner Financial was affiliated with Dresdner Bank, a large and longstanding German bank that had recently been acquired by another financial institution, and that he and other Dresdner principals had connections to the German financial institution and had plans to acquire several banks to expand Dresdner's operations.   In actuality, however, Dresdner was a fictitious entity; it had no recognizable offices in Chicago, Illinois or elsewhere, and the telephone number listed on its website for its corporate headquarters, in reality, was the number for a prepaid cellular telephone listed under a fictitious name. Nor did the defendant, co-defendant Lunn or any of the Dresdner affiliates have any connections to the former German bank or any other legitimate financial institution for that matter.

F.     As related in Dresdner's website and in its other written promotional materials, and as further explained by both defendants and their affiliates in follow up conversations, the Bullet and Rocket and .44 Magnum Programs promised investors extraordinary, above-market returns with no risk and on a short term basis. Investors were told that in exchange for an upfront payment by the investor, characterized as an "entry fee," Dresdner would lease or otherwise acquire one or

more bank instruments on behalf of the investor, which Dresdner would, in turn, "nearly simultaneously" "monetize" by providing the instruments to a third party lender who would extend non-recourse loans on the instruments.   Investors were further told that they would be guaranteed a certain loan-to-value on these non-recourse loans, thereby guaranteeing them certain minimum returns, and that because the loans were non-recourse, the funds disbursed to investors would not have to be repaid by the investors themselves.   Instead, investors were told, the leased bank instruments, after serving as the vehicle for investor payouts, would then be placed by Dresdner on a bank trading platform and, through successive trades, used to generate the funds to repay the lessors of the bank instruments, as well as to pay Dresdner and its affiliates their fees and commissions on the transactions. In this manner, Dresdner and its affiliates would receive their payouts at the 'back end' of the transactions and investors' entry fees would serve only to lease the bank instruments.

G.      As both programs were explained, investors' actual returns would depend largely on the entry fee amounts that they were willing to pay; typically, the greater the entry fee, the larger the promised return.  While the timing, entry fee amounts and promised returns were changed over time, most of the investors who were solicited for the .44 Magnum Program were promised at least a guaranteed $2 million return on a minimum entry fee of $44,000 (a return of in excess of 4,000%) and were typically promised that these returns would be delivered within 10 to 12 banking days but, in no event, beyond a month's time from receipt of the entry fee. Similar representations were made to investors solicited for the Bullet and Rocket investment program; they were typically promised that the minimum entry fee of $10,000 would yield a $100,000 (or 1,000%) return within 10 days and that they could receive a 1,000% return within the same time span at other entry fee levels as well.   They were also told that they could realize up to 2,000% in

returns on a minimum entry fee of $250,000 if they waited 30 days. And with some variations on the program, investors were even promised up to a 5,000% return on their money. Regardless of particular dollar amounts promised a particular investor at a particular point in time, both programs were represented in writing as being "100% guaranteed," both in terms of their success and the actual returns being promised.   In the case of the .44 Magnum Program, investors were also told that Dresdner would further insure the bank instruments through an "insurance wrap" obtained through an established insurance company such as Lloyd's of London.

H.      Investors, upon being drawn to the Bullet and Rocket and .44 Magnum investment programs through Dresdner's website and its affiliates' solicitations, were typically directed to review sets of agreements, assurance letters, and written instructions that the defendant had prepared in connection with the programs.   This investment program paperwork was made available to the investors either through the Dresdner website or through its affiliates.   As investors and their representatives engaged in their reviews, affiliates would often direct them to co-defendant Lunn, and at times the defendant, to review and answer questions about the investment programs.   Either co-defendant Lunn or the defendant would then conduct telephone conferences with the affiliates and investors and representatives for this purpose and to review the investment program paperwork. In many of these conversations, and in preliminary solicitations, investors and their representatives were falsely assured that the defendant and co-defendant Lunn had had prior success with Dresdner's investment programs and that earlier Dresdner investors had seen their promised returns.

I.      Once this process was completed, investors and their representatives were directed to execute the investment program paperwork and return the completed documents to co-defendant Lunn. The investors and their representatives were then directed to wire transfer their

11

entry fees for the programs to a bank account that co-defendant Lunn maintained in the name of WGC Group with JP Morgan Chase Bank, which account co-defendant Lunn oversaw and exclusively controlled.   They were told that their investment funds would thereafter be accepted for investment, and that they would be eligible to participate in the investment programs, once the investors had passed Dresdner's "compliance" review. In fact, however, no such review was undertaken; the funds were simply accepted for deposit by the defendants, and no review was undertaken of investors' qualifications by either defendant or by any of the Dresdner affiliates.

J.      In all, through these solicitations and representations, the defendant and co-defendant Lunn took in approximately $5,845,768 from 72 investors or groups of investors located throughout the United States and abroad, over the course of February 2010 through February 2011, as purported entry fees for the Bullet and Rocket and .44 Magnum investment programs. Pursuant to co-defendant Lunn's understanding with the defendant, virtually all of this money was received into co-defendant Lunn's WGC Group business bank account with JP Morgan Chase Bank.   Co-defendant Lunn provided investors and their representatives copies of their completed investment program paperwork and maintained a set of these records on behalf of himself and the defendant.[5]

K.      Although the Bullet and Rocket and .44 Magnum investors were promised that their money would be returned to them within a short period of time, together with the promised returns, none of the investors received their money back within the time frames initially promised,

---

[5]      The two defendants also worked together in enlisting people to become Dresdner affiliates.   The defendant identified and recruited a number of the persons who became affiliates and prepared documentation to sign them up as affiliates. Co-defendant Lunn typically oversaw the process of having affiliates execute the documentation and maintained these records.   Both defendants participated in explaining the investment programs to newly recruited affiliates, and co-defendant Lunn thereafter served as a point of contact for the affiliates in their dealings with the defendant and in connection with the investment programs generally.

nor did any receive the types of returns initially promised to them. None but a handful of investors received any money back at all. Co-defendant Lunn, through the Dresdner affiliates and, at times directly, continually advised investors that their payouts would take place on particular dates, only to then postpone the dates by five to seven days, or more, as the payout deadlines approached. When payout timelines were missed, various excuses were given to the investors as to the reason for the delay. Investors were reassured that they would receive their payout. The excuses, for the most part, came from co-defendant Lunn and were relayed to the investors through the Dresdner affiliates. However, on occasion, the defendant would intercede with particularly problematic affiliates or investors or investor representatives to reassure them that the investment programs were on track and would being paying out the promised returns.

L.      The excuses for the delay in the payouts included the following: (1) that the designated insurance company was behind schedule in providing the "insurance wraps" for the bank instruments; (2) that there were delays in moving necessary funds into or out of the United States; (3) that transactions involved in facilitating the programs' payouts were pending approval by the United States Federal Reserve or the United States Securities and Exchange Commission ("SEC"); (4) that there were other holds placed on Dresdner's funds by banks and governments; (5) that the Dresdner principals were working through tax reporting issues; (6) that "paymasters" and others responsible for transactions facilitating the programs' payouts were taking longer than expected to complete their work; (7) that some of the delays were due to "bank holidays"; (8) that compliance reviews were still not completed; (9) that the transactions were being reviewed by Homeland Security; and (10) (ultimately) that lawsuits that certain groups of investors were

13

beginning to bring were holding up the process.[6]  All of the various excuses were, as both defendants knew, false and ungrounded in the truth. Neither the defendant, nor co-defendant Lunn, nor any of the Dresdner affiliates, or those on their behalf had undertaken to do or initiate the particular things which co-defendant professed were the causes for the payout delays.

M.      As both defendants knew, most, if not all, of the approximately $5.8 million in investor funds wire transferred into co-defendant Lunn's WGC Group business account was not used for anything even remotely connected to securing the bank instruments promised under the Dresdner investment programs or to otherwise facilitate realizing the promised returns through the other aspects of the programs, such as obtaining "insurance wraps" and arranging for third parties to "monetize" the instruments.   Instead, at times acting under the defendant's direction and at times alone, co-defendant Lunn disbursed most of the money for patently unrelated purposes, including for personal living expenses for himself and the defendant.[7]  These unrelated disbursements included the following:

M.1.   Cash Deliveries to the Defendant.   Shortly after receiving the first investor deposits, as part of his arrangement with the defendant, co-defendant Lunn started withdrawing and accumulating cash, primarily at various branches of JP Morgan Chase Bank in and about Boulder and Denver, Colorado, which he then arranged to transport to the defendant in or about

---

[6]      The origin of some of these excuses, according to co-defendant Lunn, was the defendant; other excuses, co-defendant Lunn later admitted in investigative testimony taken before the U.S. Securities and Exchange Commission ("SEC") pursuant to a parallel civil investigation, Lunn just made up in order to prolong the process.

[7]      According to co-defendant Lunn, while he was tasked with acting as the recipient and *de facto* custodian of investors' funds, it was the defendant who undertook primary responsibility, in the first instances, for securing the bank instruments to be "monetized" under the investment programs and to otherwise facilitate using investors' funds to accomplish the tasks that were professed as being required to generate and realize the promised returns under the programs.   Various Dresdner affiliates would testify that it was their impression and understanding that this was the defendant's role and responsibility as well and that they perceived Lunn to be subordinate to the defendant in the administration and conduct of the Dresdner programs.

Albuquerque, New Mexico, Las Vegas, Nevada, and Los Angeles, California.  According to

co-defendant Lunn, once he accumulated the cash requested by the defendant, he would put the

cash in a bag or envelope and either drive or fly to meet the defendant in these various locations.

On two occasions, when meeting the defendant in Las Vegas, co-defendant Lunn, upon arrival in

that city, made additional large cash withdrawals, as part of his arrangement with the defendant,

which money he then provided to the defendant and the defendant would then use for gambling

and entertainment with co-defendant Lunn and others, and for expensive jewelry and clothing

purchases, and the balance of which the defendant pocketed.   On other occasions, when driving to

meet the defendant in Los Angeles, co-defendant Lunn would stop off in Las Vegas and withdraw

additional large sums of cash for the defendant, which he would carry with him on the remainder

of his trip to see the defendant. Once in Los Angeles, as part of their arrangement, co-defendant

Lunn would withdraw even more cash, which he then delivered to the defendant.   In all, between

February, 2010 and October, 2010, co-defendant Lunn made twelve separate trips to meet with the

defendant, providing the defendant a total of approximately $806,000 in cash.[8]

> M.2.    Western Union & MoneyGram Transfers for the Defendant.  Beginning in late

February 2010 and continuing through February 2011, co-defendant Lunn also sent investor funds

to the defendant, at the defendant's request for himself and on his behalf to other persons, through

---

[8]    The twelve trips are catalogued in the Second Superseding Indictment in this case, in a table setting forth
Counts 27 through 37 (Docket Entry No. 67).   Certain of the larger cash withdrawals that made up some of the cash
delivered to the defendant on these trips are alleged as overt acts to Count 45 of this same indictment (Docket Entry
No. 67, 2nd Superseding Indictment, Count 45, Overt Acts G through L).

Co-defendant Lunn acknowledged to the SEC and FBI agents investigating this case that, based on his
conversations with the defendant, he knew virtually from the beginning of their collaboration on the Dresdner
investment programs that the defendant had no intention of using the investor money as promised. The government
does not dispute that, during their collaboration, co-defendant Lunn also had no intention of using investor funds as
promised and represented to the investors.

Western Union and MoneyGram money transfers.   Co-defendant Lunn typically made these transfers by making cash withdrawals from various branches of JP Morgan Chase Bank in and around Boulder, Colorado and providing the cash to clerks at nearby stores housing these money transfer businesses.   Alternatively, he would use a debit card linked to the business account to fund the transfers. The transfers would typically be in amounts ranging between $200 and $1,000 and would often be made out in names of fictitious payees arranged between the defendant and co-defendant Lunn in advance or in the names of certain people designated by the defendant. Using pre-arranged codes, the defendant or a person designated on his behalf would then typically pick up the wired cash at Western Union and MoneyGram locations in and about Albuquerque, New Mexico and various locations in Southern California. In all, co-defendant Lunn sent approximately $139,341 in funds to or for the defendant through these money transfers.[9]

M.3.   Setting Up and Funding Offshore Accounts. Once investor funds started coming into co-defendant Lunn's WGC Group business bank account, the defendant, according to co-defendant Lunn, directed Lunn to form several corporations and other entities domiciled outside of the United States as part of a plan devised by the defendant to remove and hold the Dresdner investor funds outside of the United States.   Co-defendant Lunn set up at least four such foreign entities and set up foreign bank accounts in the names of three of these entities.   Lunn expended approximately $10,377 in investor funds to do so. He then transferred approximately $20,000 in investor funds to three of these bank accounts for Matrix Holdings Gmbh, Concord

---

[9]        Over the course of December 2010 and January 2011, co-defendant Lunn also paid the defendant approximately an additional $10,481 out of funds that he had on hand which were not derived from Dresdner investor deposits.

Latin America, and Prime Western Group AG, three of the entities.[10]

M.4.    Co-Defendant Lunn's Use of Investor Funds for Personal And Unrelated Expenses.

Co-defendant Lunn also used a portion of the investor funds accumulated through the Dresdner investment programs for his own purposes.   Some of these purposes, such as for general living expenses, were generally known to the defendant, according to co-defendant Lunn, but others were not.   The government traced approximately $796,000 in investor funds to personal expenditures that co-defendant Lunn made on his behalf or to support his family. Approximately $1,005,318 in investor funds was traced to payments that co-defendant Lunn made, unbeknownst to the defendant, as gifts of money or of merchandise or other tangible assets for, and in connection with the entertainment of, three professional escorts whom co-defendant Lunn befriended in Las Vegas, Nevada in or about August or September 2010.

N.        As delays in the promised investor payouts mounted, a portion of the investor funds that were coming into co-defendant Lunn's WGC Group business account were used as part of an effort to conceal defendant's and co-defendant Lunn's ongoing diversions and misappropriations of investor money and their lack of progress in using the investors' money to secure and "monetize" the bank instruments as promised and advertised under the Bullet and Rocket and .44 Magnum investment programs. Some of these expenditures were directed and planned by the defendant or done with his knowledge and approval. Others were not.   All were designed to mollify Dresdner affiliates and investors, in the face of the protracted payout delays, or done in an effort to convince the latter that the investment programs were starting to work.

N.1.    Payments of "Advances" on Dresdner Affiliate Commissions.   Beginning as early

---

[10]        These funds, once deposited offshore, were not, in fact, accessed by or accessible to the defendant but rather remained in co-defendant Lunn's control throughout the times material to this case.

as in or about June 2010, the defendant and co-defendant Lunn began hearing from certain Dresdner affiliates about the delays in the promised investor payouts. These affiliates complained, in particular, about how the delays prevented them from being paid their commissions on the investor funds that they had brought in on the Dresdner investment programs and how they were now in need of money. In order to address these concerns, the defendant told co-defendant Lunn and the affiliates that he would start paying the affiliates advances on the commissions that the affiliates would earn and otherwise receive upon the investor payouts. In order to help fund these commission advances, the defendant advised co-defendant Lunn and these affiliates that he would raise the entry fee amounts for the Bullet and Rocket and .44 Magnum investment programs. The defendant then prepared and circulated to co-defendant Lunn and the Dresdner affiliates a schedule that described the new set of investor entry fees, the corresponding commission advances that affiliates could expect to receive from the entry fees, and the final expected payouts and disbursements from those payouts. Co-defendant Lunn thereafter started making payments of purported advance commissions to the Dresdner affiliates, in accordance with this schedule (or revisions thereof), out of the investor entry fees that the affiliates caused to be sent to the defendants. As the investment scheme progressed, and as the amounts in investor funds misappropriated by them accumulated, the defendants had to start applying some of the entry fees received on behalf of newer investors in order to fund advance commission payments on entry fees received on behalf of earlier investors. They nevertheless concealed this fact from the newer investors and instead misled the investors into believing that their entry fees would be used instead to secure and monetize the promised bank instruments and for related aspects of the high yield transactions that they advertised. In all, co-defendant Lunn, acting on the defendant's direction, made approximately $1,442,950 in purported advance commission payments to

18

Dresdner affiliates.

N.2.    <u>Ponzi Payments to Select Investors and Investor Groups</u>.   Unbeknownst to the defendant, co-defendant Lunn also made payments to three sets of individual investors or investor groups of funds in excess of their principal investments when these investors started to express concerns about the delays in their promised payouts.   Co-defendant Lunn told these investors that the payments were either partial payouts on the investment programs, which were starting to operate, or were advances on future expected payouts from the programs.   The payouts were at least twice what the investors had paid in purported entry fees and in some cases well above this level.   At least one group of investors threatened to contact law enforcement agents if it did not see some immediate return on its investment.   In all, co-defendant Lunn returned approximately $1,150,000 to these three sets of investors, paying the investors collectively more than $800,000 above their principal investments.   These payments were funded from recent entry fees that the defendants were receiving from newer investors that affiliates were bringing into the Dresdner investment programs.

N.3.    <u>Refund Payments to Select Investors</u>.   Co-defendant Lunn also refunded certain investors and groups of investors their entry fees when they persisted in complaining about the protracted delays in the promised investors payouts.   Lunn made full refund payments to eight such investors or investor groups, totaling approximately $203,000. The refund payments were also made unbeknownst to the defendant.

O.    In order to fund the foregoing payments and to continue to fund their collective misappropriations, the defendant and co-defendant Lunn both concealed from later Dresdner investors and from the affiliates soliciting these later-stage investors that the .44 Magnum and Bullet and Rocket programs were not functioning as advertised in their written promotions about

the programs and that none of the earlier investors had actually received any funds based on returns from investments in these programs.   They concealed from these investors as well that virtually none of the earlier investors' funds had been used as promised under the investment programs but had been diverted and misappropriated instead.   When questioned, they stated that programs had been functioning, earlier investors had been paid some or all of the promised returns and that larger and final payouts anticipated under the programs were imminent.   By late December 2010, on the defendant's instructions, co-defendant Lunn and the Dresdner affiliates also began to promise investors even greater returns to compensate investors for the delays.   As the promised payout deadlines approached, however, in order to deflect payout demands, the defendant devised a "roll over program", under which pre-existing Dresdner investors were encouraged to "roll over" their expected returns into additional investments in the Dresdner programs, on the prospect that doing so would further enhance investors' returns and allow them to achieve their investment goals with more leverage.   Written materials showing how the "rollout program" could achieve enhanced returns were prepared by the defendant and circulated among the affiliates and the investors.

P.      By late January and early February 2011, co-defendant Lunn began confiding to certain Dresdner affiliates that the Dresdner investor entry fees that he had received for the investment programs had not been used as contemplated under the programs.   Co-defendant Lunn blamed the defendant for misusing the investor funds and for the lack of progress in obtaining and "monetizing" and using the bank instruments promised under the programs.

Q.      By in or about late February 2011, the SEC began an investigation into the Dresdner investment programs and began issuing subpoenas for records and testimony to co-defendant Lunn and certain of the Dresdner affiliates. Shortly thereafter, the defendants ceased

regularly communicating with one another and their collaboration effectively came to an end.

**Evidence Re: Count 23 (Wire Fraud)**.

R.    One of the Western Union money transfers that co-defendant Lunn made to the defendant out of investor funds (generally described in Paragraph M.2 above) took place on or about December 2, 2010.  On or about that date, co-defendant Lunn went to a supermarket in Boulder, Colorado and used his WGC Group business account debit card to transfer approximately $866 from WGC Group's bank account to the supermarket, as part of a Western Union money transfer transaction conducted with an employee at the supermarket operating a Western Union terminal.   Acting on the defendant's request, Lunn completed a Western Union form directing an $800 money transfer be made to a person identified in Count 23 of the Second Superseding Indictment as "S.R.," the name for which person he received from the defendant. In addition, co-defendant Lunn provided a test question, and answer to that question, that he had been given by the defendant, which was required to be used by the intended recipient with Western Union in order to receive the money transfer. Upon completing the transaction, co-defendant Lunn received a reference number for the money transfer, an MTCN code, which he passed along to the defendant.

R.1.    The following day, a person using the name S.R. went to the business premises of a money exchange business called Continental Currency in Hollywood, California, and using the MTCN code and test question and answer, received $800 in currency from a Western Union terminal situated within the business premises.   The transaction information was imparted to this terminal by way of interstate wire communications among Western Union computer facilities operating in the States of Colorado, North Carolina and California.

R.2.    At the time of the transaction, the defendant was residing in Southern California in

21

a place proximate to the money exchange business where the transaction took place.

**The Government's Financial Analysis and Loss Calculations.**

S.      The government analyzed co-defendant Lunn's bank accounts and other records, together with bank accounts and records of various Dresdner affiliates and investors, to determine the amount of funds obtained by the defendant and co-defendant Beebe and the resultant losses to the Dresdner investors.[11]   The government's calculations, based on this analysis, are as follows:

S.1.    Approximately $5,845,768 was taken in from Dresdner investors on the Rocket and Bullet and .44 Magnum investment programs, or similar Dresdner investment programs, between February 2010 and February 2011.

S.2.    These funds came from a combination of 72 individual investors or groups of investors.  As discussed above, three of these investors or investor groups received payments back to them in excess of their principal investments.   Eight investors or investor groups received refunds of their entire principal investments.   The remaining 61 investors or investor groups suffered total or partial loss of their principal investments. Collectively, the net loss to these net losing investors was approximately $5,124,795.[12]

## VI.     ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. §3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court

---

[11]      The defendant maintained no bank accounts in his own name or in the names of entities he controlled. No records were obtained from him as part of the investigation.

[12]      This amount takes into account the $83,000 in post-scheme payments made to an investor group by co-defendant Lunn.

in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A.     The base guideline is U.S.S.G. §2B.1, with a base offense level of **7**, pursuant to 2B1.1(a)(1), because Count 23 of the Second Superseding Indictment, the wire fraud offense of conviction, has a statutory maximum term of imprisonment of 20 years.

B.     Specific Offense Characteristic 2B1.1(b)(1)(J) applies because the applicable loss is greater than $3,500,000 but not more than $9,500,000, increasing the Offense Level by **18** Levels.

C.     Specific Offense Characteristic 2B1.1(b)(2)(A) applies because the offense conduct involved 10 or more victims, increasing the Offense Level by **2** Levels.

D.     The government currently takes no position as to whether the defendant's offense conduct involved sophisticated means, within the meaning of Specific Offense Characteristic 2B1.1(b)(10)(C), warranting an additional 2 Level increase in the defendant's Offense Level score, pursuant to this provision.   The defendant's position is that this Specific Offense Characteristic does not apply.

E.     The government's position is that the defendant's Offense Level score should be increased **3 additional levels**, pursuant to U.S.S.G. § 3B1.1(b), because the defendant acted as a manager or supervisor in criminal activity that involved five or more participants or was otherwise extensive. The defendant's position is that this Specific Offense Characteristic does not apply and he did not have an aggravating role in the offense conduct.

F.     The parties believe that there are no other victim-related, role-in-offense, obstruction adjustments which apply with respect to the offense conduct associated with this count

23

of conviction. U.S.S.G. Parts 3A-3C.

G.      The Total Offense Level would accordingly be Level **30**, assuming no offense level adjustment for sophisticated means, based on the government's sentencing guideline positions.

H.      The defendant is currently eligible to receive a **3-level** offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1 based on his timely notification of his intention to resolve this case by guilty plea.   The resulting offense level, based on the government's current calculations, would therefore be **Level 27**, assuming no adjustment owing to sophisticated means to the Total Offense Level for the wire fraud count of conviction.

I.      The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court.   Based on the parties' current information (*i.e.*, prior countable state convictions in Florida and New Mexico resulting in 5 criminal history points), if no other information were discovered, it is estimated that the defendant's criminal history category would be **Category III**.

J.      Based on the parties' current information, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

K.      The advisory guideline range resulting from the estimated offense level of (H) above, and the (tentative) criminal history category of (I) above, based on the government's current calculations, is **87-108** months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, an estimated offense level 27 (the government's current position) above could conceivably result in a range from 70 months (bottom of Category I), to 162

24

months (top of Category VI).[13]

      L.     Pursuant to guideline §5E1.2, assuming the government's estimated offense level of (H) above, the fine range for the offenses of conviction would be $25,000 to $250,000, plus applicable interest and penalties.

      M.    Pursuant to guideline §5D1.2, if the Court imposes a term of supervised release, that term shall be at least one year but not more than three years.

      S.     Restitution is mandatory in this case under U.S.S.G. §5E1.1(a)(1).

**3553 Advisement**.

      The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

---

[13]     Should there be a two level sophisticated means upward adjustment to the government calculated Total Offense Level score for the wire fraud offense of conviction, and the Final Total Offense Level accordingly be determined to be Level 29, then the resulting range could conceivably be from 87 months (bottom of Category I), to 188 months (top of Category VI).

Except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. §3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. §3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: _01/15/2016_

Jaimes J. Beebe
Defendant

Date: _1/15/16_

David L. Owen, Jr., Esq.
Attorney for Defendant Beebe

Date: _1/19/16_

Kenneth M. Harmon
Assistant U.S. Attorney

Date: _1/19/16_

Martha A. Paluch
Assistant U.S. Attorney

27