**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 1 7 2017

JEFFREY P. COLWELL
CLERK

Criminal Case No. 14-cr-00161-REB-2

**UNITED STATES OF AMERICA,**
                    Plaintiff,

v.

**JAIMIE JON BEEBE,**
                    Defendant.

---

### DEFENDANT'S MOTION FOR A SENTENCE OUTSIDE THE ADVISORY SENTENCING GUIDELINE RANGE BASED UPON THE FACTORS SET FORTH IN TITLE 18 U.S.C. § 3553(a)

---

COMES NOW, Mr. Jaimie Jon Beebe (by and through self-representation) in accordance with Rule 47, Fed. R. Crim. P., and moves this Court for a sentence outside the advisory sentencing guideline range based upon the factors set forth in Title 18 U.S.C. § 3553(a). Specifically, Mr. Beebe respectfully requests this Court find, and impose, a sentence of 60 months on Count 23 as sufficient, but not greater than necessary, to accomplish the stated goals of sentencing.

### Procedure for Imposing Sentence

The United States Supreme Court set forth the procedure to be used by the District Court when imposing sentence and clarified the standard for review of District Court sentences by the appellant courts. *Gall v. United States,* 128 S. Ct. 586, 594 (2007); *Kimbrough v. United States,* 128 S. Ct. 558, 575 (2007).

First, the district court must accurately calculate the applicable Guidelines range. *Gall,* 128 S. Ct. at 596. After considering the correct Sentencing Guideline range, the

Page 1 of 30

district court must then consider all of the § 3553(a) factors to determine the appropriate sentence. *Id*. The district court "must make an individualized assessment based on the facts presented." *Id*. at 597. If the district court determines that a sentence outside the Sentencing Guidelines is most appropriate, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. Importantly under *Gall*, factors disfavored by the Sentencing Commission, such as the age of the defendant or family circumstances, may be relied on by the district court in fashioning an appropriate sentence. 128 S. Ct. at 602. In determining the sentence, the Guidelines are just one factor for the Court to consider. *Gall*, 128 S. Ct. at 596. The Guidelines are not to be given any favor and ***the court is prohibited from presuming that a guideline sentence is reasonable***. 128 S. Ct. at 597 (Emphasis added).

Gall makes clear the sentencing court has broad discretion in determining the appropriate sentence under 18 U.S.C. 3553(a) and that the court is not bound by the confines of the Guidelines. In rejecting a Guideline-centric approach to sentencing, the Supreme Court recognized that the sentencing judge has greater familiarity with the case and the defendant before it than the appellate courts or the Sentencing Commission and is therefore "in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 128 S. Ct. at 597-98; *see also Kimbrough*, 128 S. Ct. at 574.

## 18 U.S.C. 3553(a) Sentencing Factors

The primary directive in Section 3553(a) is for sentencing courts to "impose a

sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph 2."(emphasis added). Section 3553(a)(2) states that such purposes are:

  (a) to reflect the seriousness of the offense, to promote respect for the law, and
      to Provide just punishment for the offense;

  (b) to afford adequate deterrence to criminal conduct;

  (c) to protect the public from further crimes of the defendant; and

  (d) to provide the defendant with needed educational or vocational training,
      medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs sentencing courts to consider the following factors:

  1) "the nature and circumstances of the offense and the history and
      characteristics of the defendant" (§3553(a)(1);

  2) "the kinds of sentences available" (§3553(a)(3);

  3) "the need to avoid unwarranted sentence disparities among defendants with
      similar records who have been found guilty of similar conduct (§3553(a)(6); and

  4) "the need to provide restitution to any victims of the offense." (§3553(a)(7)).

Other statutory sections also give the district court direction in sentencing.

  Under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the §3553(a) factors, the judge is required to "recogniz[e] that **imprisonment is not an appropriate means of promoting correction and rehabilitation**"" (emphasis added). Under 18 U.S.C. §3661, "**no limitation** shall be placed on the information

concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added). In sum, in every case, a sentencing court must now consider all of the §3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in §3553(a), these statutory sentencing factors should generally trump the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since §3553(a) requires the sentence be no greater than necessary to meet the four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

## Application of the Statutory Sentencing Factors to the Facts of this Case and Reasons for a Below Guideline Sentence

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender:

#### (a) Nature and Circumstances of Offense:

Due to the extensive amount of discovery involved in this case, as well as the negotiated statement of facts contained in the plea agreement, for consistency I have stated those facts verbatim in this motion. Additional facts, pertinent to the sentencing

decision, will be emphasized by using bold print.

A.    During the times material to this case, the defendant resided in and about Southern California and Albuquerque, New Mexico and conducted his affairs under various aliases.  In or about 2009, Geoffrey Lunn, a resident of Boulder County, Colorado, who, at the time, was a self-employed real estate broker attempting to develop and pursue a real estate investment and real estate financing business through WGC Group, Inc. ("WGC Group"), a Nevada corporation that he had formed for this purpose. The defendant, utilizing the name "Robert Paluseck" had placed a Craiglist posting offering assistance in obtaining financial resources for businesses.  Geoffrey Lunn contacted "Robert Paluscek" seeking help in raising financing for his real estate investment business.

B.    Commencing in or about February 2010 and continuing through in or about March 2011, the defendant and co-defendant Lunn collaborated in offering an array of purported high yield investment programs to the investing public through a purported entity called Dresdner Financial ("Dresdner").  Through Dresdner, the defendant and co-defendant Lunn, offered two particular investment programs, known as the "Bullet and Rocket Leveraged Financing Program" ("hereinafter, the "Bullet and Rocket Program") and the ".44 Magnum Leveraged Financing Program" (hereinafter, the ".44 Magnum Program"). The defendants collected over $5.8 million in advance fees from investors in exchange for undertaking to secure for these investors commercial financing in the form of non-recourse loans backed by pledged financial instruments.  During this collaboration, the defendant held himself out to investors and others involved in the programs as "Robert Perello" or

"Bobby Perello." [4]

      C.    As part of their collaboration, co-defendant Lunn agreed, among other things, to allow a bank account he maintained for WGC Group to be used to collect and disburse investor funds taken in through the Dresdner investment programs. The defendant, for his part, among other things, created and maintained a website for the Dresdner investment programs and developed written materials describing and marketing the investment programs and various written agreements and related documents to be used with investors participating in the programs.

      D.    The defendant and co-defendant Lunn marketed Dresdner's investment

---

[4] As part of the investigation leading to this case, the government acquired an assortment of evidence linking the defendant to this alias and the use of a Dresdner email account in the name of this alias. Among other things, co-defendant Lunn identified the defendant, from photographs, as the "Robert Perello" with whom he was collaborating in connection with the Dresdner investment programs. Additionally, both co-defendant Lunn's spouse at the time and Beebe's estranged spouse and stepson, through photographs, identified Beebe and Lunn as business partners.

All three also identified Beebe's voice as that of a person who, at one point in March, 2011, identifying himself as "Bobby Perello," placed a recorded call to a telephone answering service used by Lunn. The name under which the telephone number used to place this call was subscribed, the government would further show, was an alias used by the defendant.

Additionally, various investors and other persons involved in the Dresdner investment programs would testify that they dealt - both by telephone and email messages – with a person named "Bobby Perello" or "Robert Perello" in concert with co-defendant Lunn. The government would offer analysis of telephone records, among other things, to establish that these telephone numbers were subscribed to and used by the defendant under one or more aliases.

At the time of his arrest in this case, the defendant acknowledged knowing and having business dealings with co-defendant Lunn, and admitted to receiving a total of approximately $200,000, in order to secure investment leads for Lunn, but denied using the names "Robert Perello" or "Bobby Perello" or knowing anyone by the name. He also denied knowing anything about the entity Dresdner Financial or investment programs offered through an entity by such name.

programs through the website and through a network of sales affiliates who solicited investor funds in exchange for receiving commissions based on the amounts they brought into Dresdner.   In the written materials prepared by the defendant and posted on its website, and in oral representations made by both defendants and their sales affiliates, Dresdner was portrayed as a "leader in creative Commercial Financing, Bank Instruments, Bond Programs and more" and boasted of having an "extensive network of connections with the Top-50 banking institutions in the world." Supposedly headquartered in Chicago, Illinois, the purported financial services company claimed to sponsor and administer an assortment of investment programs offering the prospect of extraordinary, above-market returns over a short period of time, which programs centered around the acquisition, purported "monetization," and trading of a variety of bank instruments, such as bank guarantees, standby letters of credit and medium term notes. The investment programs, which included the Bullet and Rocket and .44 Magnum Programs, were primarily targeted at persons and organizations seeking financing for various types of commercial projects.

E.     In written and oral communications with affiliates, investors and prospective investors, the defendant was held out by others as the founder of Dresdner and, variously, its purported president, one of its other senior officers or one of its senior consultants.  Co-defendant Lunn was portrayed as Dresdner's vice president and held himself out, at times, as being one of Dresdner's officers and, at times, as being one of its sales affiliates. Playing off of its name, co-defendant Lunn and certain of Dresdner's affiliates led various investors to believe that Dresdner Financial was affiliated with Dresdner Bank, a large and longstanding German bank that had recently been acquired by another financial institution, and that he and other Dresdner principals had connections to the German financial

institution and had plans to acquire several banks to expand Dresdner's operations. In actuality, however, Dresdner was a fictitious entity; it had no recognizable offices in Chicago, Illinois or elsewhere, and the telephone number listed on its website for its corporate headquarters, in reality, was the number for a prepaid cellular telephone listed under a fictitious name. Nor did the defendant, co-defendant Lunn or any of the Dresdner affiliates have any connections to the former German bank or any other legitimate financial institution for that matter.

F.      As related on Dresdner's website and, in its other written promotional materials, and as further explained by both defendants and their affiliates in follow up conversations, the Bullet and Rocket and .44 Magnum Programs promised investors extraordinary, above-market returns with no risk and on a short term basis. Investors were told that in exchange for an up-front payment by the investor, characterized as an "entry fee," Dresdner would lease or otherwise acquire one or more bank instruments on behalf of the investor. Dresdner would, in turn, "nearly simultaneously""monetize" those bank instruments by providing the instruments to a third party lender who would extend non-recourse loans on the instruments.  Investors were further told they would be guaranteed a certain loan-to-value on these non-recourse loans, thereby guaranteeing them certain minimum returns, and that because the loans were non-recourse, the funds disbursed to investors would not have to be repaid by the investors themselves. Instead, investors were told, the leased bank instruments, after serving as the vehicle for investor pay-outs, would then be placed by Dresdner on a bank trading platform and, through successive trades, used to generate the funds to repay the lessors of the bank instruments, as well as to pay Dresdner and its affiliates their fees and commissions on the transactions. In this manner,

Dresdner and its affiliates would receive their pay-outs at the 'back end' of the transactions and investors' entry fees would serve only to lease the bank instruments.

G.     As both programs were explained, investors' actual returns would depend largely on the entry fee amounts they were willing to pay; typically, the greater the entry fee, the larger the promised return.   While the timing, entry fee amounts and promised returns were changed over time, most of the investors who were solicited for the .44 Magnum Program were promised at least a guaranteed $2 million return on a minimum entry fee of $44,000 (a return of in excess of 4,000%) and were typically promised that these returns would be delivered within 10 to 12 banking days; but, in no event, beyond a month's time from receipt of the entry fee. Similar representations were made to investors solicited for the Bullet and Rocket investment program; they were typically promised that the minimum entry fee of $10,000 would yield a $100,000 (or 1,000%) return within 10 days and that they could receive a 1,000% return within the same time span at other entry fee levels as well. Investors were also told they could realize up to 2,000% in returns on a minimum entry fee of $250,000 if they waited 30 days. And, with some variations on the program, investors were even promised up to a 5,000% return on their money. Regardless of particular dollar amounts promised a particular investor at a particular point in time, both programs were represented in writing as being "100% guaranteed," both in terms of their success and the actual returns being promised.  In the case of the .44 Magnum Program, investors were also told that Dresdner would further insure the bank instruments through an "insurance wrap" obtained through an established insurance company such as Lloyd's of London.

H.     Investors, upon being drawn to the Bullet and Rocket and .44 Magnum

Page 9 of 35

investment programs through Dresdner's website and its affiliates' solicitations, were typically directed to review sets of agreements, assurance letters, and written instructions that the defendant had prepared in connection with the programs.   This investment program paperwork was made available to the investors either through the Dresdner website or through its affiliates.   As investors and their representatives engaged in their reviews, affiliates would often direct them to co-defendant Lunn, and at times the defendant, to review and answer questions about the investment programs.   Either co-defendant Lunn or the defendant would then conduct telephone conferences with the affiliates and investors and representatives for this purpose and to review the investment program paperwork. In many of these conversations, and in the preliminary solicitations, investors and their representatives were falsely assured the defendant and co-defendant Lunn had prior success with Dresdner's investment programs and that earlier Dresdner investors had seen their promised returns.

I.     Once this process was completed, investors and their representatives were directed to execute the investment program paperwork and return the completed documents to co-defendant Lunn. The investors and their representatives were then directed to deposit, via wire transfers, their entry fees into an account at JP Morgan Chase Bank which co-defendant Lunn oversaw and maintained exclusive control. This account was previously opened in the name of WGC Group, an entity co-defendant Lunn created for his real estate investment and real estate financing business. The investors and their representatives were told their investment funds would thereafter be accepted for investment, and that they would be eligible to participate in the investment programs, once the investors had passed Dresdner's "compliance" review. In fact, however, no such review

was undertaken; the funds were simply accepted for deposit by the defendants, and no review was undertaken of investors' qualifications by either defendant or by any of the Dresdner affiliates.

 J. In all, through these solicitations and representations, the defendant and co-defendant Lunn took in approximately $5,845,768 from 72 investors or groups of investors located throughout the United States and abroad, over the course of February 2010 through February 2011, as purported entry fees for the Bullet and Rocket and .44 Magnum investment programs. Pursuant to co-defendant Lunn's understanding with the defendant, virtually all of this money was received into co-defendant Lunn's WGC Group business bank account with JP Morgan Chase Bank.  Co-defendant Lunn provided investors and their representatives copies of their completed investment program paperwork and maintained a set of these records on behalf of himself and the defendant.[5]

 K. Although the Bullet and Rocket and .44 Magnum investors were promised that their money would be returned to them within a short period of time, together with the promised returns, none of the investors received their money back within the time frames initially promised, nor did any receive the types of returns initially promised to them.  None but a handful of investors received any money back at all. Co-defendant Lunn, through the Dresdner affiliates and, at times directly, continually advised investors their pay-outs would take place on particular dates, only to then postpone the dates by five to seven days, or more, as the payout deadlines approached.  When payout time-lines were missed, various

---

[5] The two defendants also worked together in enlisting people to become Dresdner affiliates.  The defendant identified and recruited a number of the persons who became affiliates and prepared documentation to sign them up as affiliates. Co-defendant Lunn typically oversaw the process of having affiliates execute the documentation and maintained these records.  Both defendants participated in explaining the investment programs to newly recruited affiliates, and co-defendant Lunn thereafter served as a point of contact for the affiliates in their dealings with the defendant and in connection with the investment programs generally.

excuses were given to the investors as to the reason for the delay.   Investors were reassured that they would receive their payout.  The excuses, for the most part, came from co-defendant Lunn and were relayed to the investors through the Dresdner affiliates. However, on occasion, the defendant would intercede with particularly problematic affiliates or investors or investor representatives to reassure them the investment programs were on track and would be paying out the promised returns.

L.      The excuses for the delays in the pay-outs included the following: (1) the designated insurance company was behind schedule in providing the "insurance wraps" for the bank instruments; (2) there were delays in moving necessary funds into or out of the United States; (3) the transactions involved in facilitating the programs' pay-outs were pending approval by the United States Federal Reserve or the United States Securities and Exchange Commission ("SEC"); (4) there were other holds placed on Dresdner's funds by banks and governments; (5) the Dresdner principals were working through tax reporting issues; (6) the "paymasters" and others responsible for transactions facilitating the programs' pay-outs were taking longer than expected to complete their work; (7) that some of the delays were due to "bank holidays"; (8) compliance reviews were still not completed; (9) that the transactions were being reviewed by Homeland Security; and (10) (ultimately) lawsuits that certain groups of investors were beginning to bring were holding up the process.[6] All of the various excuses were, as both defendants knew, false and ungrounded in the truth. Neither the defendant, nor co-defendant Lunn, nor any Dresdner affiliate, or

---

[6]      The origin of some of these excuses, according to co-defendant Lunn, was the defendant; other excuses, co-defendant Lunn later admitted in investigative testimony taken before the U.S. Securities and Exchange Commission ("SEC") pursuant to a parallel civil investigation, Lunn just made up in order to prolong the process.

those operating on their behalf had undertaken to do or initiate the particular things which co-defendant Lunn professed were the causes for the payout delays.

M.    As both defendants knew, most, if not all, of the approximately $5.8 million in investor funds wire transferred into co-defendant Lunn's WGC Group business account were not used for anything even remotely connected to securing the bank instruments promised under the Dresdner investment programs or to otherwise facilitate realizing the promised returns through the other aspects of the programs, such as obtaining "insurance wraps" and arranging for third parties to "monetize" the instruments.   Instead, at times acting under the defendant's direction and at times alone, co-defendant Lunn disbursed most of the money for patently unrelated purposes, including for personal living expenses for himself and the defendant. [7]   These unrelated disbursements included the following:

M.1.    <u>Cash Deliveries to the Defendant</u>.   As part of his arrangement with the defendant, co-defendant Lunn shortly after receiving the first investor deposits, started withdrawing and accumulating cash, primarily at various branches of JP Morgan Chase Bank in and about Boulder and Denver, Colorado, which he then

---

[7]    According to co-defendant Lunn, while he was tasked with acting as the recipient and *de facto* custodian of investors' funds, it was the defendant who undertook primary responsibility, in the first instances, for securing the bank instruments to be "monetized" under the investment programs and to otherwise facilitate using investors' funds to accomplish the tasks that were professed as being required to generate and realize the promised returns under the programs.   Various Dresdner affiliates would testify that it was their impression and understanding that this was the defendant's role and responsibility as well and that they perceived Lunn to be subordinate to the defendant in the administration and conduct of the Dresdner programs.

arranged to transport to the defendant in or about Albuquerque, New Mexico, Las Vegas, Nevada, and Los Angeles, California.   According to co-defendant Lunn, once he accumulated the cash requested by the defendant, he would put the cash in a bag or envelope and either drive or fly to meet the defendant in these various locations. On two occasions, when meeting the defendant in Las Vegas, co-defendant Lunn, upon arrival in that city, made additional large cash withdrawals, as part of his arrangement with the defendant, which money he then provided to the defendant and the defendant would then use for gambling and entertainment with co-defendant Lunn and others, and for expensive jewelry and clothing purchases, and the balance of which the defendant pocketed.   On other occasions, when driving to meet the defendant in Los Angeles, co-defendant Lunn would stop off in Las Vegas and withdraw additional large sums of cash for the defendant, which he would carry with him on the remainder of his trip to see the defendant. Once in Los Angeles, as part of their arrangement, co-defendant Lunn would withdraw even more cash, which he then delivered to the defendant.   In all, between February, 2010 and October, 2010, co-defendant Lunn made twelve separate trips to meet with the defendant, providing the defendant a total of approximately $806,000 in cash.[8]

---

[8]   The twelve trips are catalogued in the Second Superseding Indictment in this case, in ta table setting forth Counts 27 through 37 (Docket Entry No. 67). Certain of the larger cash withdrawals that made up some of the cash delivered to the defendant on these trips are alleged as overt acts to Count 45 of this same indictment (Docket Entry No. 67, 2nd Superseding Indictment, Count 45, Overt Acts G through L).

Co-defendant Lunn acknowledged to the SEC and FBI agents investigating this case that, based on his conversations with the defendant, he knew virtually from the beginning of their collaboration on the Dresdner investment programs that the defendant had no intention of using the investor money as promised. The government does not dispute that, during their collaboration, co-defendant Lunn also had no intention of using investor funds as promised and represented to the investors.

M.2.   <u>Western Union & MoneyGram Transfers for the Defendant</u>.  Beginning in late February 2010 and continuing through February 2011, co-defendant Lunn also sent investor funds to the defendant, at the defendant's request for himself and on his behalf to other persons, through Western Union and MoneyGram money transfers. Co-defendant Lunn typically made these transfers by making cash withdrawals from various branches of JP Morgan Chase Bank in and around Boulder, Colorado and providing the cash to clerks at nearby stores housing these money transfer businesses. Alternatively, he would use a debit card linked to the business account to fund the transfers. The transfers would typically be in amounts ranging between $200 and $1,000 and would often be made out in names of fictitious payees arranged between the defendant and co-defendant Lunn in advance or in the names of certain people designated by the defendant.  Using pre-arranged codes, the defendant or a person designated on his behalf would then typically pick up the wired cash at Western Union and MoneyGram locations in and about Albuquerque, New Mexico and various locations in Southern California. In all, co-defendant Lunn sent approximately $139,341 in funds to or for the defendant through these money transfers.[9]

M.3.   <u>Setting Up and Funding Offshore Accounts</u>. Once investor funds started coming into co-defendant Lunn's WGC Group business bank account, the defendant, according to co-defendant Lunn, directed Lunn to form several corporations and other entities domiciled outside of the United States as part of a plan devised by the defendant

---

[9] Over the course of December 2010 and January 2011, co-defendant Lunn also paid the defendant approximately an additional $10,481 out of funds that he had on hand which were not derived from Dresdner investor deposits.

to remove and hold the Dresdner investor funds outside of the United States.  Co-defendant Lunn set up at least four such foreign entities and set up foreign bank accounts in the names of three of these entities.  Lunn expended approximately $10,377 in investor funds to do so. He then transferred approximately $20,000 in investor funds to three of these bank accounts for Matrix Holdings Gmbh, Concord Latin America, and Prime Western Group AG, three of the entities.[10]

M.4.    Co-Defendant Lunn's Use of Investor Funds for Personal And Unrelated Expenses.  Co-defendant Lunn also used a portion of the investor funds accumulated through the Dresdner investment programs for his own purposes.  Some of these purposes, such as for general living expenses, were generally known to the defendant, according to co-defendant Lunn, but others were not. The government traced approximately $796,000 in investor funds to personal expenditures that co-defendant Lunn made on his behalf or to support his family. Approximately $1,005,318 in investor funds was traced to payments that co-defendant Lunn made, unbeknownst to the defendant, as gifts of money or of merchandise or other tangible assets for, and in connection with the entertainment of, three professional escorts whom co-defendant Lunn befriended in Las Vegas, Nevada in or about August or September 2010.

N.    As delays in the promised investor pay-outs mounted, a portion of the investor funds that were coming into co-defendant Lunn's WGC Group business account were used as part of an effort to conceal defendant's and co-defendant Lunn's ongoing diversions and misappropriations of investor money and their lack of progress in using the investors'

---

[10] These funds, once deposited offshore, were not, in fact, accessed by or accessible to the defendant but rather remained in co-defendant Lunn's control throughout the times material to this case.

money to secure and "monetize" the bank instruments as promised and advertised under the Bullet and Rocket and .44 Magnum investment programs. Some of these expenditures were directed and planned by the defendant or done with his knowledge and approval. Others were not. All were designed to mollify Dresdner affiliates and investors, in the face of the protracted payout delays, or done in an effort to convince the latter that the investment programs were starting to work.

      N.1.    Payments of "Advances" on Dresdner Affiliate Commissions. Beginning as early as in or about June 2010, the defendant and co-defendant Lunn began hearing from certain Dresdner affiliates about the delays in the promised investor pay-outs. These affiliates complained, in particular, about how the delays prevented them from being paid their commissions on the investor funds that they had brought in on the Dresdner investment programs and how they were now in need of money. In order to address these concerns, the defendant told co-defendant Lunn and the affiliates that he would start paying the affiliates advances on the commissions the affiliates would earn and otherwise receive upon the investor pay-outs. In order to help fund these commission advances, the defendant advised co-defendant Lunn and these affiliates that he would raise the entry fee amounts for the Bullet and Rocket and .44 Magnum investment programs. The defendant then prepared and circulated to co-defendant Lunn and the Dresdner affiliates a schedule that described the new set of investor entry fees, the corresponding commission advances that affiliates could expect to receive from the entry fees, and the final expected pay-outs and disbursements from those pay-outs. Co-defendant Lunn thereafter started making payments of purported advance commissions to the Dresdner affiliates, in accordance with this schedule (or revisions thereof), out of the investor entry fees that the affiliates caused

to be sent to the defendants. As the investment scheme progressed, and as the amounts in investor funds misappropriated by them accumulated, the defendants had to start applying some of the entry fees received on behalf of newer investors in order to fund advance commission payments on entry fees received on behalf of earlier investors. They nevertheless concealed this fact from the newer investors and instead misled the investors into believing that their entry fees would be used instead to secure and monetize the promised bank instruments and for related aspects of the high yield transactions that they advertised.   In all, co-defendant Lunn, acting on the defendant's direction, made approximately $1,442,950 in purported advance commission payments to Dresdner affiliates.

N.2   <u>Ponzi Payments to Select Investors and Investor Groups</u>.  Unbeknownst to the defendant, co-defendant Lunn also made payments to three sets of individual investors or investor groups of funds in excess of their principal investments when these investors started to express concerns about the delays in their promised pay-outs.  Co-defendant Lunn told these investors that the payments were either partial pay-outs on the investment programs, which were starting to operate, or were advances on future expected pay-outs from the programs.   The pay-outs were at least twice what the investors had paid in purported entry fees and in some cases well above this level.  At least one group of investors threatened to contact law enforcement agents if it did not see some immediate return on its investment.  In all, co-defendant Lunn returned approximately $1,150,000 to these three sets of investors, paying the investors collectively more than $800,000 above their principal investments.  These payments were funded from recent entry fees that the

defendants were receiving from newer investors that affiliates were bringing into the Dresdner investment programs.

N.3     Refund Payments to Select Investors.  Co-defendant Lunn also refunded certain investors and groups of investors their entry fees when they persisted in complaining about the protracted delays in the promised investors pay-outs. Lunn made full refund payments to eight such investors or investor groups, totaling approximately $203,000. The refund payments were also made unbeknownst to the defendant.

O.     In order to fund the foregoing payments and to continue to fund their collective misappropriations, the defendant and co-defendant Lunn both concealed from later Dresdner investors and from the affiliates soliciting these later-stage investors that the .44 Magnum and Bullet and Rocket programs were not functioning as advertised in their written promotions about the programs and that none of the earlier investors had actually received any funds based on returns from investments in these programs. They concealed from these investors as well that virtually none of the earlier investors' funds had been used as promised under the investment programs but had been diverted and misappropriated instead.   When questioned, they stated that programs had been functioning, earlier investors had been paid some or all of the promised returns and that larger and final pay-outs anticipated under the programs were imminent.   By late December 2010, on the defendant's instructions, co-defendant Lunn and the Dresdner affiliates also began to promise investors even greater returns to compensate investors for the delays.  As the promised payout deadlines approached, however, in order to deflect payout demands, the defendant devised a "roll over program", under which pre-existing Dresdner investors were encouraged to "roll over" their expected returns into additional

investments in the Dresdner programs, on the prospect that doing so would further enhance investors' returns and allow them to achieve their investment goals with more leverage. Written materials showing how the "rollout program" could achieve enhanced returns were prepared by the defendant and circulated among the affiliates and the investors.

P.     By late January and early February 2011, co-defendant Lunn began confiding to certain Dresdner affiliates that the Dresdner investor entry fees that he had received for the investment programs had not been used as contemplated under the programs. Co-defendant Lunn blamed the defendant for misusing the investor funds and for the lack of progress in obtaining and "monetizing" and using the bank instruments promised under the programs.

Q.     By in or about late February 2011, the SEC began an investigation into the Dresdner investment programs and began issuing subpoenas for records and testimony to co-defendant Lunn and certain of the Dresdner affiliates. Shortly thereafter, the defendants ceased regularly communicating with one another and their collaboration effectively came to an end.

**Evidence Re: Count 23 (Wire Fraud)**.

R.     One of the Western Union money transfers that co-defendant Lunn made to the defendant out of investor funds (generally described in Paragraph M.2 above) took place on or about December 2, 2010. On or about that date, co-defendant Lunn went to a supermarket in Boulder, Colorado and used his WGC Group business account debit card to transfer approximately $866 from WGC Group's bank account to the supermarket, as

part of a Western Union money transfer transaction conducted with an employee at the supermarket operating a Western Union terminal. Acting on the defendant's request, Lunn completed a Western Union directing an $800 money transfer be made to a person identified in Count 23 of the Second Superseding Indictment as "S.R.", the name for which person he received from the defendant. In addition, co-defendant Lunn provided a test question, and answer to that question, that he had been given by the defendant, which was required to be used by the intended recipient with Western Union in order to receive the money transfer. Upon completing the transaction, co-defendant Lunn received a reference number for the money transfer, MTCN code, which he passed along to the defendant.

R. 1.    The following day, a person using the name S.R. went to the business premises of a money exchange business named Continental Currency in Hollywood, California, and using the MTCN code and test question and answer, received $800 in currency from a Western union terminal situated in the business premises. The transaction information was imparted to this terminal by way of interstate wire communications among Western Union computer facilities operating in the states of Colorado, North Carolina and California.

R. 2.    At the time of the transaction, the defendant was residing in southern California in a place proximate to the money exchange business where the transaction took place.

**(b) History and Characteristics of Mr. Beebe:**

**CRIMINAL HISTORY**

Mr. Beebe has numerous arrests and convictions which resulted in sentences of probation but have not resulted in criminal history points being assessed due mainly to the age of the convictions. Only a couple of these have resulted in any sentence of incarceration. The first was for a Third Degree Theft in Polk County, Iowa, in which he was sentenced to 76 days in jail. The second was a conviction for Criminal Mischief in the Fourth Degree where he was sentenced to 37 days in jail.

In 2002, while living in Fort Lauderdale, Florida, Mr. Beebe pleaded guilty to Grand Theft in the Third Degree and was sentenced to 235 days in jail and was given 235 days credit for time served. While on probation for this offense, Mr. Beebe violated the conditions of probation and was sentenced to 18 months in Florida state prison. Also in 2002, in Fort Lauderdale, Florida, Mr. Beebe pleaded guilty to Driving Under the Influence and received a sentence of 6 months' probation.

On December 9, 2014, Mr. Beebe was sentenced by the Second Judicial District Court in Albuquerque, New Mexico to 18 months' probation for Falsely Obtaining Services. Mr. Beebe had not paid a hotel bill to the MCM Eleganté Hotel.

On February 28, 2013, Mr. Beebe, while in the country of Andorra, was jailed for approximately 10 months. On April 11, 2014, and within a few months following his release on December 23, 2013 from the Andorran jail, Mr. Beebe returned to the United States to spend some time with his two children and was subsequently taken into custody by U.S. Customs Officials upon returning through the Miami International

Airport. That arrest was based on the active warrant out of New Mexico which Mr. Beebe later pleaded guilty to as previously mentioned herein involving the unpaid hotel bill which resulted in the 12 month probation sentence.

### MARRIAGE and CHILDREN

Between 1991 and 1998, Mr. Beebe was in a committed relationship with Ms. Lisa Marie Scipione. One child, Giovanni Fiorello, was born of this union. The relationship with Ms. Scipione unfortunately terminated around the time wherein Giovanni reached 18 months of age.

In 2005, Mr. Beebe married Ms. Lorena Elizabeth Lucero. One child, Alesandro Fabrizio, was born of this union. Mr. Beebe maintained daily contact with Alesandro up until September 2012 when the marital relationship was mutually terminated between the parties and Mr. Beebe relocated back to Europe where he has (*for over seven years since 2002*) periodically resided. The couple was officially divorced in mid-2014.

### EMPLOYMENT HISTORY

Mr. Beebe has worked in the telemarketing business (*both managing and owning phone rooms since as far back as 1992*); he's owned two residential/commercial cleaning companies (*Friendly Sparkle and Shine & Crystal Clean, LLC*); a food cart business (*Dos Hermano's*); two custom built computer firms (*Micro Custom & X-Micro Technologies*); a Wi-Fi installation firm (*Orion Wi-Fi, LLC*); a residential/commercial security firm (*SecurePro, LLC*); and a few other businesses over the years.

**PHYSICAL HEALTH**

Mr. Beebe suffered brain damage due to forceps being introduced during a breeched birth procedure as a subsequent result of a substantially difficult pregnancy term which his mother was subjected to.

Mr. Beebe has not seen an American doctor in well over 20 years and only since losing his eyesight at the age of 23 wherein he received treatments from the Baylor School of Medicine in Houston, Texas. The treatments were unfortunately unsuccessful in their attempts to restore and preserve his vision. Today, Mr. Beebe's remaining eyesight (*in his right eye*) is rapidly diminishing as a direct and combined result of his losing the vision in his left eye, and the exacerbated strain subsequently placed on his right eye for his not having his prescription eyewear.

While in Europe, Mr. Beebe was diagnosed with some brain tumors and in Andorra La Vella, Andorra (*Europe*) he was diagnosed with Hepatitis C.

**FUTURE PLANS**

Mr. Beebe has extremely ambitious and optimistic plans for his livelihood upon being released from incarceration.  Aside from re-locating back to Lugano, Switzerland and Marina di Ravenna, San Marino, Italy, Mr. Beebe looks to continue developing several of his technological innovations through the forming (*launching*) of various companies, (aside from his current firm, ***Black Horse Technology Group, AG),*** in doing so, Mr. Beebe fully intends to bring certain specialized and proprietary products to market. The technologies referred to involve: near-infra-red Ramon Spectroscopy (*NIRS*) portable threat-detection solutions (*molecular identification*); electrical pulse

(*electrode stimulation*) for stroke rehabilitation tools; high-frequency laser pulse (*atomic stabilization dynamics*); stimuli-responsive materials; programmable materials/matter, (*e.g. microrobotics artificial muscles, advanced smart actuator systems, including memory alloys, dielectric polymers, electro-active polymers and polymer hydrogels*); ultramalleable devices, such as artificial/electronic skin (*flexible sensor mechanics*), digital nano-nerves, stretchable silicon electronics; high-efficiency photoelectrochemical (*PEC*) solar cells (*fuel conversion*); crystalline silicon solar cells (*photovoltaic devices*); and other technology advancements.

The spectroscopy systems in particular that Mr. Beebe looks to produce and distribute to global governments were specifically (*and intentionally*) designed for certain law enforcement agencies, including: ATF, CIA, DHS, DIA, FBI, FEMA, TSA, and military use.

From 2011 to 2013, Mr. Beebe has contributed a great deal of focus and effort in developmental aspects involving the advanced portable threat-detection diagnostics tools that quite honestly "redefine" the world's public safety field standards with *mobilized scanning capabilities that are far superior to anything else that's presently available on the market*. The end result was two (2) versions of diagnostics equipment: each utilizing a 4w 732nM near-infra-red laser component for light spectrum analysis testing (*sampling*). The basic set up is a near-infra-red Ramon spectroscopy (*NIRS*) technology which tests in parts-per-million (*ppm*) range, with a result (*gain*) ~ 1:03, while allowing an accelerated response-/result-time of only 7 to 30 seconds. The more advanced version is not only capable of accurately detecting explosive materials, fuels,

narcotics, and pharmaceutical stock testing of carbonate purity levels, but the surface enhanced Ramon spectroscopy (*SERS*) probe methodology, provides a much more enhanced result (*gain*) ~ 1:100.6 (*meaning an increase in the input-to-sample power-level return spectrum to 100.6 – instead of a 0.3 return spectrum – so, the return sample is driven up to over 100.6 times the input*), thereby, getting down to be able to test biologics (*carbon*) in parts-per-billion (*ppb*) range. In other words; the more sophisticated SERS solution is also capable of analyzing exposed liquids, combustible gases, and biological agents. From there, a waveguide (*micro-slide*) is used, at which point a qualified operator would dope the nano-spheres and using basic laboratory spinners, the desired results would be available. Of course, there's much more that's involved with the SERS approach, such as entry angles, RX angles, and other proprietary inputs. Those processes are to be performed at EVAP Chambers, such as semiconductor schools throughout North America by renting chamber-time.[11]

---

[11] This technology would very likely award Mr. Beebe a Nobel Prize in chemistry, physics, and optics.

2.  **The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

    **(a) To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense:**

A sentence of 60 months is a sufficiently extended period of time to reflect the seriousness of the offense. Financial fraud, committed through the use of wire communications, is a very serious offense; however, a sentence of more than 60 months would be greater than necessary to accomplish the goals of sentencing. Mr. Beebe is currently 45 years old. By the time he is released from 60 months of incarceration he will be 49 years old. The period of incarceration thus far has instilled an inherent change in his attitude toward the necessity for the rules of the law in order to prevent a societal dissent into chaos. Five years of incarceration is sufficient, but not greater than necessary to provide just punishment for this offense.

**(b) To afford adequate deterrence to criminal conduct:**

Given Mr. Beebe's current age of 45 and his projected age of 49, after 60 months incarceration, he will be at the age of life where the internal desire to be involved in criminal activity has diminished. Additionally, not only will Mr. Beebe be subjected to 3 years of Supervised Release upon his release from the Bureau of Prisons, he will also have an increased criminal history score. This translates into a greater degree of punishment should he commit any future crimes. In other words, his next sentence, given his current age, could be a sentence to life in prison. Therefore, a sentence of 60 months, given Mr. Beebe's age and future prospects provides an adequate deterrent to criminal conduct.

**(a) To protect the public from further crimes of the defendant:**

As the two objectives in subsections (b) & (c) of Title 18 U.S.C. § 3553(a) appear to seek the same goal, please refer to the argument for subsection (b).

**(b) To provide the defendant with needed medical care or other correctional treatment in the most effective manner:**

In Mr. Beebe's particular case, a 60 month period of incarceration would be more than adequate to provide him with any medical services required. He has sufficient intellectual ability to understand and relate complex scientific concepts. His employment prospects are considerable due to his knowledge in these areas, and therefore, his period of incarceration does not need to exceed 60 months.

There exists some degree of needed medical care. As noted in the Presentence Investigation Report Mr. Beebe has been diagnosed with tumors in his head and Hepatitis C. However, these medical conditions can be addressed within a 60 month period of incarceration. Should the tumors in his head actually be cancerous, it is most likely he will not survive for the 60 month period. If; however, these tumors are benign there will be no need for medical treatments which would extend past the 60 month period of incarceration. The diagnosis of Hepatitis C is a lifetime condition and would not be eradicated even if the period of incarceration extended past the 60 month time-frame. Therefore, a period of 60 months incarceration would be sufficient, but not greater than necessary to accomplish the sentencing goal of providing needed medical care.

### 3. The Kinds of Sentences Available:

**Statutory**

Pursuant to Title 18 U.S.C. § 1343 imprisonment of not more than 20 years.

**Probation**

A sentence to probation is prohibited by Title 18 U.S.C. § 3561(a)(2).

**Sentencing Guidelines**

2B1.1(a)(1)(A)…………Base Offense……………………………………………7

2B1.1(b)(1)(J)…………More than $3,500,000.00…………………………………18

2B1.1(b)(2)(A)(I)………More than 10 victims………………………………………2

2B1.1(b)(10)(C)………..Sophisticated Means……………………………………2

3B1.1(b)………………..Manager or Supervisor……………………………………3

                                                        32

3E1.1(a)………………..Acceptance of Responsibility……………………………-2

                                                        30

3E1.1(b)………………..Super Acceptance………………………………………-1

                          Adjusted Offense Level......................................................**29**

Mr. Jaimie Beebe has a Criminal History Category of III.

Offense level **29**, Criminal History Category III provides a guideline range of **108 – 135 months**.

**Supervised Release**

Pursuant to Title 18 U.S.C. § 3583(b)(2) not more than 3 years.

**Fine**

Pursuant to Title 18 U.S.C. § 3571 a fine of not more than $250,000.00.

**Mandatory Special Assessment**

Pursuant to Title 18 U.S.C. § 3013(a)(2)(A) the amount of $100.00 per count of conviction.

Wherefore, the reasons stated above, Mr. Beebe respectfully requests this court to consider the above discussed factors, find a sentence within the sentencing guideline range is greater than necessary to accomplish the goals of sentencing established in Title 18 U.S.C. § 3553(a) and find a sentence of 60 months incarceration on Count 23 sufficient, but not greater than necessary to accomplish the sentencing goals.

Respectfully Submitted: 03/12/2017

/s/ Jaimie Jon Beebe

**Jaimie Jon Beebe**
**F.C.I. Englewood,**
**Littleton, C.O. 80123**