FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 17 2017

JEFFREY P. COLWELL
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 14-cr-00161-REB-2

**UNITED STATES OF AMERICA,**
      Plaintiff,

v.

**JAIMIE JON BEEBE,**
      Defendant.

---

## DEFENDANT'S MOTION FOR OBTAINING BOTH INDEPENDENT EXPERT WITNESS TESTIMONY INVOLVING NEUROLOGICAL / NEUROPSYCHOLOGICAL ASSESSMENTS / EVALUATIONS AND CORRESPONDING MAGNETIC RESONANCE IMAGING ("MRI") STUDIES

---

  COMES NOW, Mr. Jaimie Jon Beebe (by and through self-representation) in accordance with Title 18 U.S.C. § 3553(a), and moves this Court to allow for the defendant to be given a deference in this matter for a period (term) of up to ninety (90) days for the purpose of proffering a full neurological and neuropsychological assessment along with a separate MRI (brain-scan) study and an associated expert witness testimony specifically concerning areas of previous clinical diagnosis pertaining to certain physiological dysfunction (organic neurological disorders); including schizophrenia and its impact on the defendant's cognition and behavior, particularly his "<u>extreme impulsive nature</u>".

  Up until this point, this right has been denied unto the defendant. His ongoing requests and cries made unto his previous council, David L. Owen, have nonetheless been ignored which would seem to be an indicator of a potential violation of his rights thereof, and which, if further ignored, are likely to result in the defendant suffering prejudice at the sentencing phase.

The defendant's previous clinical diagnosis of several medical professionals relating to his organic impairment should afford him the opportunity of obtaining current test results which are subsequently likely to reveal "some level of preexisting neurological deficit", and such (brain-data) would be considered as **"critical mitigating evidence"** unto Mr. Beebe's defense strategy.

It is well known that nuclear medical studies can demonstrate brain-based abnormalities, which may suggest that a particular defendant has a limited capacity for self-control.

The question is one of causation: is there indeed (undiscovered) sufficient evidence to allow <u>not</u> just psychiatric but <u>also</u> neurological experts to offer a full clinical diagnosis and expert testimony explaining how Mr. Beebe's brain abnormality was directly related to his previous criminal behavior as well as other emotionally associated mitigating factors?

To be clear; the defendant is not in any way seeking to suggest to this Honorable Court that he suffers from a debilitating disorder which in some way contrasts with the stricter and currently accepted tests of an individual's ability to accurately distinguish right from wrong. Nor is Mr. Beebe even attempting to suggest that he, at any point, lacked certain human brain control executive functions, such as the ability to reason and to plan. Moreover, Mr. Beebe is in no way what-so-ever looking to persuade this Honorable Court that, due to his previous severe brain trauma and frontal lobe damage, that the resulting impairment specifically affected his areas of judgement, insight or foresight. These, are in no way, the suggestions which the defendant wishes to make.

Furthermore, it is not the intention of Mr. Beebe to put forward any claims of incompetence. However, a corroborated injury history that led to demonstrated cognitive

impairment, including evidence which could be presented through neurological and neuropsychological testing, (structural brain-scans) involving Magnetic Resonance Imaging ("MRI"), and/or (functional brain-scans) involving Single-Photon Emission Computed Tomography ("SPECT"), or Positron Emission Tomography ("PET"), otherwise collectively referred to as ("Neuroimaging Studies") in Mr. Beebe's defense should be considered relevant mitigating evidence that this Honorable Court consider to be a significant factor in further determining Mr. Beebe's adequate sentence.

Mr. Beebe's previous childhood testing has shown that he had suffered from a neurological impairment which caused substantial difficulties, such as extreme emotional distress, including overwhelming problems with his academic development which thereby severely hampered his psychological and social development because it made it extremely difficult to make friends and caused him to be inept in social interaction. This would be labeled as a learning disability in today's terms, and for which, he was continually punished by the schools that he attended since as far back as the 3rd grade.

Whereas, there has been sufficient previously diagnosed disorders (preexisting conditions) from the defendant's childhood, which, if overlooked by the court, would severely disable Mr. Beebe's defense — and such disorders had a direct association with the impairment of Mr. Beebe's "impulse control", which is a form of cognitive function.

On more than one occasion, the defendant has been previously diagnosed with a strong lack of impulse control and clinical diagnostic reports have labeled him as "extremely impulsive by nature".

Up until this point, this Honorable Court, has expressed its desire to provide the defendant all the rights afforded him. One of those rights includes "access to a competent neurologist and neuropsychologist (<u>not merely a psychiatrist</u>) in addition to a full and appropriate MRI examination", while thoroughly evaluating the defendant; and then preparing and ultimately presenting his or her findings before this Honorable Court in order for such neurological and neuropsychological conditions (*which may be identified, along with any and all applicable brain-scan results*); thus, demonstrating unto the court certain \\organic brain dysfunctions\\ which may thereinafter be weighed as such brain-data and clinical analysis should be considered to be a <u>significant factor prior to sentencing</u>.

### 1.  *Deficient Performance*

Whereas, on numerous occasions throughout the course of the relationship (communications and dealings) with the defendant's former attorney of record, David L. Owen, the defendant has brought significant attention to the fact that for several years throughout his childhood, he was not only kept under the regularly scheduled care and ongoing counseling of a combined number of nearly a dozen psychologists practicing in both Texas and Iowa; and has been further diagnosed by neurologists and neuropsychologists over the years, but Mr. Beebe has in fact also been subjected to multiple full neurological examinations (investigations) which have involved:

    a) Electroencephalograms (EEG's)
    b) Electrocardiograms (EKG's)
    c) Magnetic Resonance Imaging scans (MRI's)
    d) Positron Emission Tomography scans (PET's)
    e) Single-Photon Emission Computed Tomography scans (SPECT's) *

\* These SPECT scans were used during Mr. Beebe's earlier childhood years from the time of initially diagnosing his previous epileptic conditions and subsequently allowing the accurate characterization of Mr. Beebe's neurodegenerative disorders, including his severe brain trauma (resulting from his breach birth), and his occasional seizures throughout his younger years (from ages 5 through 9).

Furthermore, Mr. Beebe has repeatedly emphasized unto Mr. Owen that not only had he undergone a difficult delivery (breach birth procedure), but due to the use of forceps during his birth, Mr. Beebe was unfortunately brought into this world with a physically indented left frontal lobe. Subsequent brain scanning revealed structural and functional deficits of his brain — damage specifically to the left frontal, temporal, and insular regions — the prefrontal cortex and impaired connections between the frontal lobe and associated limbic brain regions (unilateral frontotemporal cerebral dysfunction).

Mr. Beebe made it abundantly clear that as a result of his mother's severely stressful pregnancy term[1] that he was later diagnosed with several mental and emotional (psychiatric and neurological) disorders, including:

   a) Autism Spectrum Disorder (at age 2)
   b) Epilepsy (at age 5)
   c) Attention Deficit and Severe Hyperactivity Disorder (at age 6)
   d) Impulse Control Disorder (at age 7)
   e) Organic Brain Impairment / Brain Dysfunction (at age 8)
      - Neurological Deficit Disorder
      - Cerebral Glucose Metabolism Deficiencies
   f) Social Anxiety Disorder (at age 12)
   g) Multiple Personality Disorder (at age 14)

---

[1] During the course of the defendant's mother's relationship with the defendant's paternal father, she was continually subjected to near daily beatings and raping's. This had an enormously draining emotional and physical effect on Mr. Beebe's mother, resulting in the aforementioned breach birth procedure to which nonetheless had a profound impact on several mental and neurological components of the defendant's brain and psychological state throughout both his entire childhood and adult life.

      h) Borderline Schizophrenia (at age 15)
      i) Obsessive Compulsive Disorder (at age 15)
      j) Metabolic Depression / Severe Clinical Depression (at age 15)
      k) Dependent Personality Disorder (at age 15)

and other neuropsychiatric impairments and brain-based abnormalities, collectively resulting in severe traumatic brain injury as a direct effect of the difficult pregnancy term (wherein the defendant's mother was continuously beaten and raped); as well as the subsequent breach birth procedure involving the introduction of forceps.

There were also many previous clinical diagnosis of being "extremely compulsive" by numerous psychologists throughout Mr. Beebe's childhood years.

The combination of the ongoing severe clinical depression and heavy alcohol abuse during much of Mr. Beebe's adult years, had left him with very poor coping skills.

His severe alcohol abuse continued up until his self-recovery in 2012. The fact that Mr. Beebe's mother died at an early age (in 2007); then, Mr. Beebe's lack of solid family ties to anyone other than his grandfather (Howard Wayne Speck) and his late aunt (Norma Weigel), placed substantial duress and mental strain on the defendant for a number of years. Mr. Beebe's grandfather had a diminished capacity to maintain lengthy telephonic communications and after suffering a heart attack and being placed into an assisted living facility (2007), the communications continued to degrade. After suffering immensely from heart disease and diabetes, the defendant's only remaining aunt, Norma, had more recently passed (in late 2009). These factors, coupled with several other significant stressors, such as his troubled marriage, likely resulted in a rapid deterioration of his functioning throughout the time-frame lasting from 2009 to late 2012; wherein Mr. Beebe was clearly subjected to a mid-life crisis from multiple angles.

Mr. Beebe had repeatedly requested (of his former assigned defense council, David L. Owen), that he persuade the court to allow him to proffer a brain-scan ("MRI") and professional neurological and neuropsychological assessments.

An attorney's failure to gather brain-data wherein a defendant has previously disclosed such neurological and neuropsychological damage or dysfunction (mitigating evidence) would be ineffective assistance of counsel, particularly when the defendant has informed his counsel or the psychologist that was contracted to conduct a psychological evaluation of the defendant; and wherein such information was merely ignored[2].

The former council, David L. Owen, instead requested of the court a psychological review (a psychological evaluation of the defendant rather than seeking to gather brain-data).

The defendant needed (as he previously stated on numerous occasions unto Mr. Owen) a neurological work up *not* psychological intervention.

The court must not overlook the differences between the completely different areas of medical practice. It is important to emphasize that particular weight should always be given by a trier of fact during sentencing to evidence of <u>organic brain injury</u> because of the effect of such evidence on a finding of <u>moral culpability</u>[3].

Any reasonable attorney under these circumstances would have filed a Motion for the neurological and neuropsychological assessment(s) which would have further entailed an MRI scan — a scan that may likely reveal white matter hyper-intensities in

---

[2] *Strickland v Washington*, 466 U.S. 668, 691, 694 (1984)
[3] *Id.* at 1257-1258, in *Douglas v Woodford*, 316 F.3d 1079 (9th Cir. 2003), wherein the appellate court determined ineffective assistance of counsel, wherein the defendant's counsel failed to investigate and present mitigation evidence of "possible organic impairment" or "some level of preexisting neurological deficit". *Id.* at 1086.

the frontal lobe of the defendant's brain (organic neurological irregularities), in an area believed to be responsible for <u>regulating emotion</u> and <u>impulse control</u>.

Because evidence of such an organic disorder is the kind of mitigating evidence by which a defendant's "moral culpability would have been reduced", a reasonable attorney would seek and obtain that evidence and present it to the court[4].

<u>Both, the former counsel's previous, ongoing failure to present evidence of a "preexisting organic neurological condition", or file a Motion seeking to proffer such brain-data at the sentencing phase, or the court's failure to allow such clinical assessments prior to or at the critical sentencing phase **is sufficiently prejudicial to establish ineffective assistance of counsel**</u>[5].

---

[4] *Caro v Ryan*, 280 F.3d 1247, 1257-1258 (9th Cir. 2002). Nevertheless David L. Owen totally neglected to do so even though the defendant repeatedly requested (and insisted upon) neurological and neuropsychological intervention, while continually expressing his concern over Mr. Owen's complete lack in cooperating in this matter. Such failure and utter disregard on behalf of Mr. Owen is clearly unjustified and subsequently disables Mr. Beebe's defense at the most important aspect of the case — the sentencing phase. Mr. Beebe had therefore been prejudice by Mr. Owen's ineffective assistance.

[5] *Ake v Oklahoma* 470 U.S. 68, 83 (1985) (emphasis added). Under Ake, an MRI constitutes part of an "appropriate examination", which is one of the "raw materials integral to the building of an effective defense" which must be provided to the defendant. *Id.* at 77. No reasonable counsel, knowing that controlling authority on a <u>critical issue had not been properly presented</u> (through a psychological evaluation alone) would have declined to even *attempt* to file a subsequent motion for a neurological and neuropsychological evaluation along with a supportive MRI examination (brain-scan), as <u>an MRI and corresponding expert witness testimony is a reasonable strategic decision</u>. This is particularly the case wherein the defendant has repeatedly stressed that he would need (and rightly deserves) "neurological and neuropsychological" assessments versus "psychological". The organic neurological issue should be deemed by the court as a critical issue when determining sentencing. Furthermore, counsels slight-of-hand should not mislead anyone; characterizing an MRI examination as merely additional "mental health evidence" blurs an important distinction. Evidence of "organic brain dysfunction could provide significant mitigating evidence". *Summerlin v Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (en banc). Defense council accordingly had a "duty to investigate and present mitigating evidence of mental impairment". *Bean v Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998). *Cullen v Pinholster*, 131 S. Ct. 1388 (2011) does not bear on the analysis. Moreover, *Pinhholster* did not modify the standard for deficient performance set forth in *Strickland*. *Pinholdter* reaffirmed that, under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations *unnecessary*". *Id.* at 1407. (*Strickland*, 466 U.S. at 691) (Alterations emphasis omitted). Under this standard, should the court deny the defendant's request herein for further neurological and neuropsychological examination (*specifically the MRI work up*), it would be therein deemed unjust and unreasonable without question. There is <u>absolutely no way</u> that the defendant's former defense counsel, David L. Owen, could have made a reasonable decision that a mitigation strategy at sentencing based on Mr. Beebe's "organic brain disorder" was *not* the superior one *without first investigating and factually determining* whether Mr. Beebe in fact had such a disorder.

Page 8 of 13

Mr. Owen should have moved this Honorable Court to allow there to be conducted a thorough investigation.

This is clearly the one (1) subject which Mr. Owen neglected that he should have known mattered the most.

Further testing <u>is</u> necessary to appropriately (clinically) determine, if in fact, Mr. Beebe suffers from "organic or physiological dysfunction [sic] of the brain".

Mr. Owen purely lacks <u>any</u> excuse for *not* moving for the assessment(s) and the additional appropriate MRI examination[6].

**Argument**

A decision to deny Mr. Beebe of the neurological and neuropsychological assessment(s) or even the requested MRI (brain-scan), would be unseemly and unjust, while substantially disabling his defense.

Consequently, any effort to deny meaningful opportunity for Mr. Beebe to properly obtain such professional (clinical) intervention is presumptively prejudicial, particularly in light of the potential mitigating force of such evidence.

Inconclusive neurological and/or neuropsychological findings *prior* to sentencing would be severely damaging to Mr. Beebe's defense.

Assuming *arguendo* that the government may nonetheless submit that there is no eVoucher funds to be authorized on behalf of the defense of Mr. Beebe, necessary

---

[6] See *Douglas v Woodford*, 316 F.3d 1079 (9th Cir. 2003). Indeed the Supreme Court has made clear that 'evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background... may be less culpable than defendant's that have no such excuse". *Penry v Lynaugh*, 492 U.S. 302, 319 (1989), (sighting *California v Brown*, 479 U.S. 538, 545 (1987) (*O'Connor, J. concurring*)). Thus, it would be entirely unreasonable to broach the mental health issue", <u>*even if the court determined that organic neurological disorders and personality disorders are indistinct.*</u>

for satisfying the associated expense(s) of the selected and qualified expert witness(es) whom can effectively provide the assessment(s) and full MRI examination(s), Mr. Beebe would be able to arrange for the corresponding financial requirements to be met.

However, it is inadvertently the clear assumption of the defendant that the government will be in favor of allowing the eVouchers to be authorized — specifically when considering the fact that the initial <u>psychiatric evaluation</u> was in fact an err on behalf of the former defense counsel, David L. Owen.

Furthermore, by <u>*not*</u> offering to further probe into the impact of schizophrenia on the defendant's behavior — particularly his "<u>*extremely impulsive nature*</u>" — would demonstrate a clear argument that such examination(s) may likely have been intentionally excluded from evidence, particularly wherein the co-defendant has ultimately cooperated with the government and has subsequently therefore been granted a fifty-four (54) month term of sentence for his actions throughout the course of the scheme.

It is believed by the defendant to be a transcendent interest afforded him to be granted the opportunity for such clinical assessment(s) *prior* to his sentencing phase. Mr. Beebe merely respectfully requests that this Honorable Court be mindful of these issues and the *reasonable* arguments pertaining to this matter which are elaborately and plainly described and presented herein.

Whether Mr. Owen chose not to move for an MRI workup and the corresponding neurological and neuropsychological assessment(s) *prior* to getting this far along toward sentencing proceedings — notwithstanding his client's own pleading requests that he do so — for either the simple reason that he felt it would be outright flatly denied; or in fact, due to his expressed feelings that such assessment(s) were nothing more than a "wasted expense of the court" (*as he verbally stated in argument before the magistrate*

*court, presented before the Honorable Kathleen M. Tafoya)*[7], during the process of the defendant's efforts to dismiss Mr. Owen from his duty of attorney of record is still not fully and adequately understood by the defendant.

In either way however, "there was really no reason not to at least ask the judge to grant" a renewed Motion — especially in light of the failure of counsel (at the first hearing) to have requested the *proper* clinical examination(s) (assessment(s)), <u>rather than the mere psychiatric evaluation</u>" that was requested of the court in err by Mr. Owen.

Mr. Owen's feared that the Motion may have been denied or his own personal belief that such assessment(s) would be a "wasted expense of the court" **does not justify** his utter failure to even *attempt* to obtain such critical evidence that would have allowed him to make <u>the strongest argument possible in the client's favor</u>.

On a few occasions, Mr. Owen stated unto the defendant that renewing the Motion and seeking an MRI workup, therefore moving for further neurological and/or neuropsychological examinations could have "irritated" the judge, and thereby only further damaged the defendant's case and destroyed any chances of 'getting any leniency from Blackburn".

Mr. Beebe refused to take these excuses seriously, and Mr. Owen reminded the defendant of Blackburn's "nauseating reciting mannerisms" or "nauseating speech pattern" or something to that effect.

---

[7] Whereas the Honorable Kathleen M. Tafoya had confirmed unto the defendant that the intended neurological and neuropsychological assessment(s) and any corresponding MRI brain-scans would be and remain as options open to and well within the legal rights of the defendant to seek to proffer such clinical examinations and subsequently present them unto the court *prior to sentencing*.

Mr. Owen had on one occasion, stated unto the defendant that the Honorable Blackburn was "notorious for issuing contempt of court fines" and he even went on to relay a story of a real estate fraudster whom was apparently fined upwards of $1.2 million in contempt fees by the Honorable Blackburn himself.

The fact of the defendant's admission and full disclosure of his ongoing suffering from "organic impairment" — along with his continuous pleading requests of Mr. Owen to simply seek obtaining the assessment(s) and corresponding MRI test results — which would subsequently have offered or revealed "some level of preexisting neurological deficit" and which <u>was essentially ignored by Mr. Owen is a clear indication of a potential violation of the defendant's rights which would have resulted in the defendant suffering prejudice at the sentencing phase</u>.

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional adjustments support the limitations on investigation. In other words, council has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[8].

---

[8] *Strickland v Washington,* 466 U.S. at 690-691 (1984).

Dated: March 6, 2017

Respectfully Submitted,

/s/ Jaimie Jon Beebe     03/06/2017

**Jaimie Jon Beebe**
**F.C.I. Englewood,**
**Littleton, CO. 80123**
